533 F.2d 601
 174 U.S.App.D.C. 374
 NATIONAL ASSOCIATION OF REGULATORY UTILITY COMMISSIONERS, Petitioner,
v.
FEDERAL COMMUNICATIONS COMMISSION and United States of
America, Respondents.
Manhattan Cable Television, Inc., et al., Intervenors.
 No. 75-1075.
 United States Court of Appeals,
District of Columbia Circuit.
 Argued Nov. 5, 1975.
Decided Feb. 10, 1976.
 
 Stephen G. Kraskin, Deputy Asst. Gen. Counsel, Washington, D. C., for petitioner. Paul Rodgers and Kenneth E. Hardman, Washington, D. C., were on the brief for petitioner.
 Sheldon M. Guttmann, Counsel, Federal Communications Commission, Washington, D. C., with whom Ashton R. Hardy, Gen. Counsel, Joseph A. Marino, Associate Gen. Counsel, Washington, D. C., at the time the brief was filed. Carl D. Lawson and John J. Powers, III, Attys., Dept. of Justice, Washington, D. C., were on the brief for respondents.
 Thomas J. O'Reilly, Washington, D. C., with whom Lloyd D. Young, Washington, D. C., was on the brief for intervenor United States Independent Telephone Association.
 J. Laurent Scharff and W. T. Pierson, Jr., Washington, D. C., were on the brief for intervenor Manhattan Cable Television, Inc.
 Stuart F. Feldstein, Charles S. Walsh, John V. Kenny and Samuel Cooper, III, Washington, D. C., were on the brief for intervenor, National Cable Television Association, Inc.
 Before LUMBARD,* Senior Circuit Judge for the Second Circuit, WRIGHT and WILKEY, Circuit Judges.
 Opinion for the Court filed by Circuit Judge WILKEY.
 Concurring Opinion filed by Circuit Judge LUMBARD.
 Dissenting Opinion filed by Circuit Judge WRIGHT.
 WILKEY, Circuit Judge:
 
 
 1
 This action is before the court on petition for review of one aspect of FCC policy pertaining to cable television, as enunciated and clarified in recent Commission reports. Petitioner's sole objection is to the Commission's pre-emption of state common carrier regulation over the use of cable system leased access channels for two-way, point-to-point, non-video communications.[1] This court has jurisdiction to review the Orders under 47 U.S.C. § 402 (1970) and 28 U.S.C. § 2342 (1970).
 
 
 2
 The challenged pre-emption is part of a comprehensive plan for the regulation of cable television systems, which the Commission has been developing and refining since asserting jurisdiction over cable operations in 1966.[2] In particular, the pre-emption grows out of the Commission's decision in 1972 requiring that cable operators provide four categories of access channels, in addition to any broadcast or cablecast[3] programming which they chose to transmit.[4]
 
 
 3
 Under regulations promulgated at that time,[5] cable operators in major television markets[6] were required to set aside public, education, local government and leased access channels, to be made available for programming free from content control by the cable operator.[7] The regulations provide for mandatory expansion of access channelling when certain usage levels for existing channels are achieved,[8] and require that the education, local government, and at least one public access channel be made available without cost to the users.[9]
 
 
 4
 The leased access requirement involves no discrete allocation of space for one particular purpose, as is involved in the other access channel requirements. The regulations require that "portions" of bandwidth be set aside for the use of paying customers, with the proviso that such commercial operations are subject to displacement if the special purpose access channels experience greater demand than they can satisfy.[10] The regulations also require that stations which must provide access channelling also must develop a two-way communication capability,[11] so that among the many uses to which leased access bandwidth may be put is two-way communications in a partly or wholly non-video mode. With regard to the leased access bandwidth, cable operators are required to "establish rules requiring first-come, nondiscriminatory access," to prohibit certain uses of the facilities (gambling, obscenity), to establish a rate schedule, and to keep a public record of all requests for time.[12] "On at least one of the leased channels, priority shall be given to part-time users. . . . "[13]
 
 
 5
 The 1972 Order initially established the general policy of leaving the access channels, including the leased access bandwidth, free of state or local regulation.[14] It was not until 1974 that the Commission made reference to the pre-emption of all regulation of the leased access bandwidth, and, more particularly, of regulation of any two-way, intrastate, non-video communications which might be carried via the cable system.[15]
 
 
 6
 In support of this pre-emption policy, the Commission rested primarily upon its overall statutory mandate ". . . to make available, so far as possible, to all the people of the United States a rapid, efficient, nation-wide, and world-wide wire and radio communications service. . . ."[16] The Commission reasoned that this language called for the development of "a nationwide broadband communications grid" in which cable systems should play an important part. It argued that the optimum development of cable would only be possible where that technology is treated as an "organic whole" under the sort of comprehensive plan which the Commission had adopted.[17] The Commission thus sought to bring the pre-emption of two-way intrastate, non-video communications within the 47 U.S.C. § 152(a)[18] grant of jurisdiction over activities "ancillary to broadcasting," which had been recognized in United States v. Southwestern Cable Company,[19] and United States v. Midwest Video Corporation.[20]
 
 
 7
 The issue before this court involves the construction of that "ancillary to broadcasting" standard, and its application to a set of facts which differs in some respects from those in Southwestern or Midwest. In determining whether there is Commission jurisdiction over activities on the basis of their relationship to broadcasting (which is subject to regulation under Title III of the Act[21], it is necessary to weigh the statutory purposes served by allowing such jurisdiction, against those which would thereby be impaired. Thus at the outset it is appropriate to inquire, as did the Supreme Court in Southwestern,[22] whether any statutory commandments are directly contravened by the asserted pre-emption of state power over these two-way, non-video communications by cable.
 
 I. Impact of 47 U.S.C. § 152(b)[23]
 
 8
 Section 152(b) of Title 47[24] explicitly denies Commission jurisdiction over intra state common carrier operations, except as section 301 pertaining to radio may dictate to the contrary.[25] This section of the opinion will deal with the common carrier and intrastate prerequisites of the jurisdictional exclusion. The proviso for Commission powers otherwise granted under § 301 will be considered briefly here and in Section II, dealing with the asserted statutory support for the Commission's pre-emption action.A. Has the Commission attempted to pre-empt state and local regulation of common carrier activities?
 
 
 9
 The Commission argues that the two-way, non-video communications via cable, over which it has pre-empted state and local regulation, are not common carrier communications because they are carried on by entities (cable operators) previously adjudged to be non-common carriers.[26] However, it has long been held that "a common carrier is such by virtue of his occupation," that is by the actual activities he carries on.[27] Since it is clearly possible for a given entity to carry on many types of activities, it is at least logical to conclude that one can be a common carrier with regard to some activities but not others. Deferring to the next section any final ruling on the Commission's holistic view of cable operations,[28] we will proceed at this point to examine the particular activities over which the pre-emption is asserted, to determine if they fall within the common carrier concept as used in the statute.
 
 
 10
 In a recent case of the same name as that now before the court, we set forth our understanding of the common carrier concept as invoked by the Communications Act.[29] We concluded that the circularity and uncertainty of the common carrier definitions set forth in the statute[30] and regulations[31] invite recourse to the common law of carriers. An examination of the common law reveals that the primary sine qua non of common carrier status is a quasi-public character, which arises out of the undertaking "to carry for all people indifferently. . . ."[32] This does not mean that the particular services offered must practically be available to the entire public; a specialized carrier whose service is of possible use to only a fraction of the population may nonetheless be a common carrier if he holds himself out to serve indifferently all potential users. Nor is it essential that there be a statutory or other legal commandment to serve indiscriminately; it is the practice of such indifferent service that confers common carrier status.[33] That is to say, a carrier will not be a common carrier where its practice is to make individualized decisions in particular cases whether and on what terms to serve.[34]
 
 
 11
 A second prerequisite to common carrier status was mentioned but not discussed in the previous N.A.R.U.C. opinion.[35] It is the requirement formulated by the FCC and with peculiar applicability to the communications field, that the system be such that customers "transmit intelligence of their own design and choosing."[36]
 
 
 12
 Applying these two tests to the two-way, point-to-point, non-video communications over which the Commission here asserts its pre-emptive power, we conclude that a common carrier activity is involved. We are able to reach this conclusion, even though there is no evidence before us arising from any actual operations in the two-way, non-video mode, by examining the nature of the projected activity and the regulatory framework in which it is expected to operate.
 
 
 13
 As to the first prerequisite of common carrier status, the regulations as originally promulgated by the 1972 Order establish a policy of "first-come, nondiscriminatory access."[37] Although a binding requirement of such indifferent service is not necessary to confer common carrier status, it is an adequate substitute for evidence of actual operations, for we know what those operations will be if the FCC regulations are followed.
 
 
 14
 It is true that this general commandment of indifferent service is modified by the Commission's acceptance, or even requirement, of certain types of priority treatment. The regulations themselves state that "(o)n at least one of the leased channels, priority shall be given part-time users. . . ."[38] As the Commission explained, however, this measure was necessitated to prevent monopolization of the leased access bandwidth by entrepreneurs leasing bandwidth for extended periods.[39] The requirement is thus designed to assure open access to all users, and it does not detract from the common carrier status of those subject to it.
 
 
 15
 The Commission has also stated its tolerance, for the time being at least, of preferential rate structures whereby leased access channelling is made available to noncommercial users at reduced cost.[40] While such sanctioned price discrimination is difficult to square with the common law notion of indifferent service to all willing customers, we hold that it is fundamentally consistent with the essence of the common carrier concept. As we stated in our previous N.A.R.U.C. opinion, the common denominator of common carriers is their quasi-public character.[41] We stated at that time that an undertaking to carry for all indifferently "appears to be essential" to the quasi-public character.[42] However, price discrimination in favor of non-commercial public, education, and governmental users presents no obstacle to the conclusion that a common carrier activity is involved. To the contrary, such action, at least if not carried to the point of excluding all commercial users, appears to enhance rather than detract from the enterprise's dedication to public purposes and affectation with the public interest.
 
 
 16
 With regard to the second common carrier prerequisite, the user's design and choosing of the intelligence to be transmitted, we have no difficulty determining from the very nature of the technology that in many if not most instances this requirement will be satisfied. Although the regulations require only a non-voice return capability,[43] which would perhaps make possible transmissions of only a rudimentary sort,[44] the content of the transmission (which may arise solely from the determination to transmit or not[45] may nonetheless be under the customer's control. We therefore hold that any two-way use of cable in which the customer explicitly or implicitly[46] determines the transmission or content of the return message, satisfies this second prerequisite to common carrier status.
 
 
 17
 We therefore conclude that most, if not all, of the uses to which the two-way, non-video cable capability is likely to be put fall within the term "carrier" as used in 47 U.S.C. § 152(b).
 
 
 18
 B. Has the Commission attempted to pre-empt state and local regulation of intrastate activities?
 
 
 19
 It is uncontroverted that the two way communications at issue will be intrastate insofar as they are carried on by a cable network entirely encompassed within a single state.[47] Properly, we think, no contention has been made that all communications within a given cable network take on an interstate character, due to the interstate, broadcast source of many transmissions.[48] The relationship between return transmissions over an entirely intrastate cable network, and receipt of interstate broadcast signals at the headend of the cable network is too remote to justify such a conclusion. In many instances the only relationship will be that both activities are carried on by a single operator.
 
 
 20
 We therefore conclude that, for purposes of determining § 152(b) applicability, the intrastate requirement demands nothing more than a single determination of which cable networks are entirely within a single state's boundaries. We leave that to be resolved by the Commission and appropriate state authorities, by their respective assertions of jurisdiction.
 
 
 21
 C. Does 47 U.S.C. § 301 provide any basis for Commission jurisdiction over two-way, non-video cable transmissions?
 
 
 22
 The § 152(b) jurisdictional bar contains an exception proviso for any powers granted the Commission under § 301. No allegation has been made that this proviso is applicable to this case, and we find nothing in § 301 to cast doubt on the apparent consensus of counsel.[49]D. Conclusion
 
 
 23
 It appears to us that the substantial bulk of the two-way, non-video communications expected to be carried over leased access bandwidth will be both intrastate and common carrier in nature. The plain meaning of § 152(b) therefore seems to bar the Commission's assertion of a general pre-emptive power over all uses of access bandwidth. Whether the context of the Communications Act taken as a whole calls for a different result will be considered in the next section.
 
 
 24
 II. Alleged Statutory Justification for the Commission's Pre-emption Action.
 
 
 25
 The Commission seeks to justify its pre-emptive action as within a general grant of jurisdiction over cable TV, which, it states,[50] has been twice recognized by the Supreme Court.[51] It argues that "the services of cable are indivisible," and thus that the two Supreme Court affirmances of FCC powers over cable must be seen as establishing a jurisdiction over all activities of cable operators.[52] As a fall back position, the Commission seems to argue that even if the Supreme Court has not declared a blanket FCC jurisdiction over all cable activities, the pre-emption presently asserted fits within a reasonable reading of one or both of the earlier cases.[53] In order to evaluate these two lines of argument, it is necessary to examine in some detail the Supreme Court's treatment of the cable television problem.
 
 
 26
 Commission jurisdiction over cable television was first reviewed by the Supreme Court in 1968 in United States v. Southwestern Cable Company.[54] The action was a challenge to a Commission order restricting the area in which a cable company might operate.[55] The Court first examined the activities of cable operators and their interaction with broadcast stations.[56] The Justices were led to agree with the Commission's findings that cable operations were expanding rapidly and that this "explosive growth"[57] might jeopardize Commission progress in its statutorily justified pursuit of a wider development of television broadcasting. Especially threatened was the growth of educational television and public broadcasting over UHF channels.[58]
 
 
 27
 On this basis the Court upheld the Commission's order, not directly under either the common carrier title[59] or the title pertaining to radio broadcasting,[60] but under a residual delegation found in § 152(a).[61] The Court determined that the language of this introductory section stating that the Act pertains to "all interstate . . . communications by wire or radio" was sufficient basis for the Commission actions at issue. The authority recognized under § 152(a) was carefully "restricted to that reasonably ancillary to the effective performance of the Commission's various responsibilities for the regulation of television broadcasting."[62]
 
 
 28
 In 1972 the Southwestern reasoning was invoked again to affirm a Commission order, but this time one whose ultimate justification in the Commission's statutory powers over broadcasting was less immediately apparent. In United States v. Midwest Video Corporation,[63] a sharply divided Court upheld an order requiring cable operators with 3500 or more subscribers to facilitate and transmit locally originated productions. Four members of the Court concluded that the origination requirement was within the range of Commission powers reasonably ancillary to broadcasting, because its effect was "to assure that in the retransmission of broadcast signals viewers are provided suitably diversified programing . . . ."[64] They arrived at this result by reasoning that Southwestern sustained an "authority to regulate CATV with a view not merely to protect but to promote the objectives for which the Commission had been assigned jurisdiction over broadcasting."[65]
 
 
 29
 The deciding vote in Midwest was cast by Chief Justice Burger, who relied primarily on the pervasive and open-ended jurisdiction that Congress had conferred upon the FCC. The courts, he said, had consistently construed the Act as granting broad enough powers "to meet the expansion and development of broadcasting. . . . CATV is dependent totally on broadcast signals and is a significant link in the (broadcast) system as a whole and therefore must be seen as within the jurisdiction of the Act."[66] He noted, however, that "the Commission's position strains the outer limits of even the open-ended and pervasive jurisdiction that has evolved by decisions of the Commission and the courts."[67]
 
 
 30
 A. Does the Communications Act as construed by the Supreme Court establish a blanket jurisdiction over all operations of cable systems?
 
 
 31
 We are not persuaded that either the statute on its face or the construction which it has been given in Southwestern and Midwest supports the Commission's argument that it has a blanket jurisdiction over all activities which cable systems may carry on. The language of § 152(a) is quite general and is not unambiguously jurisdictional in character.[68] There is nothing in the words themselves compelling a conclusion that any or all operations of a cable system are within the ambit of Commission power.
 
 
 32
 Moreover, the Court's reasoning in both Southwestern and Midwest compels the conclusion that the cable jurisdiction, which they have located primarily in § 152(a), is really incidental to, and contingent upon, specifically delegated powers under the Act. The statute's introductory section is made a locus for powers which must of necessity be recognized if the purposes set out in the broadcasting sections are to receive their fullest realization. The Court thus was not recognizing any sweeping authority over the entity as a whole, but was commanding that each and every assertion of jurisdiction over cable television must be independently justified as reasonably ancillary to the Commission's power over broadcasting.
 
 
 33
 In Southwestern, the Court stated explicitly that its holding was limited to such reasonably ancillary activities, and expressly declined to comment on "the Commission's authority, if any, to regulate CATV under any other circumstances or for any other purposes."[69] The plurality opinion in Midwest relied explicitly on the Southwestern reasoning,[70] and devoted substantial attention to establishing the requisite "ancillariness" between the Commission's authority over broadcasting and the particular regulation before the Court.[71] The Chief Justice's concurring opinion, upon which the Midwest outcome turned, stressed that the Commission action strained the outer limits of what could be justified under the statute,[72] thus suggesting that some attempted regulations of cable operations would fall outside the delegated power.
 
 
 34
 Apart from the language of the Supreme Court, we also find little basis in reason to support the view that cable must be treated as an "organic whole,"[73] within the Commission's jurisdiction. By a logical reading of the statute, the basis for so concluding would most probably involve a determination that the activities of cable operators on the fringe of the broadcast media justify their wholesale assimilation with broadcasters. However, this conclusion has been emphatically rejected in other contexts, both where the cable operations were limited to broadcast retransmission,[74] and where they involved origination cablecasting as well.[75]
 
 
 35
 In terms of policy, the Commission argues that indivisible regulation of cable television under its own comprehensive scheme is essential, if the " goal of a nationwide broadband communications grid" is to be achieved.[76] We are not convinced that this goal of nationwide communications network must, in all cases, take precedence, especially where the Commission jurisdiction is explicitly denied under other provisions of the Act.[77] But more fundamentally, we find no substantial support in the record for the Commission's view that its long term communications goals will be impaired if two-way, non-video communications over leased access channels are subjected to state or local common carrier regulation.
 
 
 36
 The Commission's policy based arguments for allowing it to assert complete jurisdiction over cable seem to fall into two categories. First, the Commission argues from a sort of housekeeping perspective, that any other result would be administratively unseemly.[78] It appears to assert that a scheme of divided regulation, with the FCC governing all except two-way, non-video, point-to-point communications, would be inappropriate and administratively unfeasible.[79]
 
 
 37
 Yet the Commission offers no reason, save its own bruised sense of symmetry, in support of this conclusion. The allocation of regulatory duties along the lines of inter- versus intrastate activities is a problem with which the Commission and state agencies must frequently deal, and have dealt successfully. Nor can the involvement of cable operators with more than one regulatory body logically be the cause of the alleged unworkability, for the Commission itself has recognized the role of local authorities in granting franchises and rights of way for the cables used.[80]
 
 
 38
 The Commission raises a second type of argument on behalf of treating cable as an organic whole. It asserts, implicitly at least, that the two-way use of leased access channelling is likely, at some future time, to provide vital revenues for the financing of other, less profitable cable activities.[81] Subjection of these activities to common carrier rate regulation, it is suggested, will put these ostensible seed-profits at the mercy of numerous state and local agencies.
 
 
 39
 The difficulty with this argument is its highly speculative character. The Commission has itself conceded that "at present there are few, if any, proven, economically viable uses for two-way cable communications."[82] The perceived necessity to require installation of a two-way capability,[83] rather than allowing market forces to bring about such installations, is further evidence of the dubious economic character of two-way communications via cable in the immediate future.[84] We therefore conclude that this argument must fail for lack of evidentiary support.
 
 
 40
 Our examination of the statute, the Supreme Court cases, and the Commission's arguments based on policy thus leads us to the view that the Communications Act does not confer any blanket Commission jurisdiction over cable. We will now proceed to inquire whether the particular jurisdiction asserted here over two-way, non-video communications can be justified as reasonably ancillary to broadcasting.
 
 
 41
 B. Is the Commission's assertion of pre-emption jurisdiction over two-way communications via cable justifiable under the "reasonably ancillary to broadcasting" standard of Southwestern and Midwest?
 
 
 42
 The Supreme Court has upheld two separate assertions of Commission jurisdiction over cable as reasonably ancillary to the Commission's powers over broadcasting. Beginning with the Court's elucidation of that "ancillary to broadcasting" rationale, we will now inquire whether the pre-emption action before us can be upheld as fitting within it. In so doing, it will be necessary to assess and compare the relationship between controverted Commission action and its conceded power over broadcasting, in our case and in the cases decided by the Supreme Court.
 
 
 43
 At the outset, it seems safe to say that Midwest rather than Southwestern presents the farthest outpost of Commission power, and thus should serve as our standard of comparison. Whereas Southwestern involved a regulation of cable whose direct purpose was the protection of broadcasting operations,[85] the Midwest origination requirement presents a far less direct and more complicated relationship with the broadcasting media.[86] Recognizing that the pre-emption before us can not be brought within Southwestern's sanction of actions protective of broadcasting, we will attempt to place our case along side of Midwest, to determine whether it falls within the concept of ancillariness there enunciated.
 
 
 44
 Midwest, without question, takes a giant step beyond Southwestern, in relaxing the nature of the ancillariness necessary to support an assertion of Commission power over cable. As we read the case, it turns upon a determination that "ancillary to broadcasting" means not only "for the protection of broadcasting," but also embodies any regulation of cable which in its own right serves the purposes pursued by broadcast regulation.[87] Since a prime purpose in the area of broadcast regulation is the assurance of variety in what appears on the home viewer's screen,[88] the Court concluded that an origination requirement aimed at providing "suitably diversified programing," is within the ancillariness standard.[89]
 
 
 45
 We have great difficulty finding any such broadcast purpose which is served by the Commission's attempted pre-emption of state and local regulation of two-way cable operations. Unlike the origination requirement of Midwest, this pre- emption does not directly affect transmission in any medium which is of direct concern under the Commission's power over broadcasting. Whereas origination cablecasting will increase the mix of available viewing choices and thus serve an important general purpose of broadcast regulation, the private nature of the non-video, return communications involved here means that no general broadcast purpose is directly implicated. It is therefore difficult to see how any action which the Commission might take concerning two-way cable communications could have as its primary impact the furtherance of any broadcast purpose.
 
 
 46
 Specifically, the Midwest order involved entertainment programs to be originated by the local cable company and transmitted over the same channels on which they transmit the programs of the regular television networks. The service that the FCC was regulating was ancillary to the service that it had been previously regulating, because locally originated programs are indistinguishable from network programs when they arrive on the television receiving set in the home. In the instant case, however, the point-to-point communications via access cables, which involve one computer talking to another or a citizen calling his city council, have no relationship whatever to entertainment programs by a national network which are now being sent by cable.
 
 
 47
 It is only slightly less difficult to locate secondary, indirect effects of the regulation which might arguably further a broadcast purpose. The only one of which we are aware involves the possibility, discussed in Part A, supra, that two-way cable communications are destined for great financial success, and that any state regulation might reduce the flow of the resulting profits into the expansion of cable operations. We do not deny that this is a possibility, though, as previously noted, its likelihood is questionable. Even were we to concede it as a certainty, however, the order's indirect way of serving the broadcast purpose would, by itself, require some extension of Midwest to encompass our case.
 
 
 48
 Under the facts of this case, we are spared from the difficult decision whether a cable regulation indirectly serving a broadcast regulatory purpose should be upheld on the same theory that one directly serving such a purpose was upheld in Midwest. Apart from the factual problem of uncertainty as to the ultimate profitability of two-way cable communications, two factors separate our situation from the ideal test case on the issue of direct versus indirect advancement of broadcast purposes.
 
 
 49
 First, in Midwest the locally originated programs which were the subject of the regulation were to compete with the offerings of the national networks and local broadcast stations, which were and are being regulated by the FCC. It was logical for the FCC to regulate the new business, i.e., the programming to be originated by cable companies, because that business was directly competitive with services which it already regulated.
 
 
 50
 In the present case, by contrast, the primary competition from the two-way utilization of cable will come from existing telephone facilities which, on an intrastate level, now operate under the regulation of state and local commissions.[90] The FCC thus seeks to extend pre-emptive jurisdiction over operations in a competitive market, which it is otherwise powerless to regulate. Unlike the Commission's action in Midwest, the order before us attempts to divide regulatory power over a single competitive market in an illogical way. The Commission's pre-emption of regulation over cable operators in a field where state rate and service regulation over non-cable operators is pervasive renders the order objectionable as unfair to the regulated entities and as creating the possibility for abuse by the unregulated cable system. This possibility assumes more significance when we observe that the Commission not only intends to pre-empt state regulation of the two-way activities, but intends to issue no regulations of its own to govern these activities, thus leaving them completely unregulated.
 
 
 51
 The concern of the FCC over its own wisdom in "establishing reasonable rates for services that are untested, unproven . . ." (quoted by Judge Wright at p. ---- of --- U.S.App.D.C., at p. 607 of 533 F.2d) may be quite justified. State regulatory agencies, engaged for years in regulating the existing competition to the proposed cable channels, are doubtless better fitted to fix those rates and in our opinion they have the right reserved by statute to do so.
 
 
 52
 Second, as set out in Section I above, the Commission's attempted pre-emption appears to run counter to the plain meaning of the 47 U.S.C. § 152(b) limitation on Commission jurisdiction. We do not categorically deny that such an apparent bar might, in some instances, properly yield to a clear, conflicting statutory delegation. But no such clear, conflicting delegation of power exists in this case. We believe that the pre-emption of regulatory power of two-way, non-video cable communications is not within the "ancillary to broadcasting" standard as developed in Midwest, even absent the apparent applicability of the § 152(b) jurisdictional bar. We therefore find no clear delegation of Commission authority as might conflict with, and possibly override, the commandment of § 152(b).
 
 C. Conclusion
 
 53
 The Commission's action before us does not come within its powers reasonably ancillary to broadcasting, which received their greatest judicial recognition in United States v. Midwest Video Corporation. We rest this conclusion (1) upon the absence of factual evidence that a broadcast purpose even indirectly will be served, (2) upon the fact that the controverted activities will be carried on in a competitive common carrier market, and (3) upon the § 152(b) bar to Commission jurisdiction over the intrastate common carrier activities. We note, however, that the binding effect of § 152(b) is substantially intertwined with our finding that, apart from that section, there is no unambiguous support, in either the statutory language or the Supreme Court's opinions, for the action which the Commission has taken.
 
 
 54
 As to any projected two-way communications not partaking of the common carrier character, we nonetheless hold, based upon the uncertainty and indirectness of the broadcast purpose allegedly served, that they are not within the Commission's jurisdiction ancillary to broadcasting.
 
 
 55
 III. Miscellaneous Arguments in Support of the Commission
 
 
 56
 Two arguments are raised on behalf of the Commission's position, which are not dealt with in the discussion above.
 
 
 57
 A. Is the challenged action within the broad discretion traditionally allowed to the FCC, especially in the construction of its own statute and in the area of experimentation?
 
 
 58
 The Commission relies to a great degree upon the substantial measure of discretion which it has traditionally been accorded under its broadly worded statute.[91] We are aware that the communications industry poses a difficult regulatory problem of rapid technological change, and we recognize that the Act was an attempt to deal with that problem by a grant of "not niggardly but expansive powers."[92] Judicial construction of the Act has made that abundantly clear.[93]
 
 
 59
 However, the allowance of "wide latitude"[94] in the exercise of delegated powers is not the equivalent of untrammelled freedom to regulate activities over which the statute fails to confer, or explicitly denies, Commission authority. It has been repeatedly recognized that Commission power over the communications industries is not unlimited, either as to the construction of the "public convenience, interest or necessity" standard[95] as applied to activities clearly within its jurisdiction,[96] or as to the extension of its jurisdiction to activities affecting communications.[97] For the discretion argument to be decisive, it must be demonstrated that the action challenged in this case is justified because of the established breadth of particular Commission powers.
 
 
 60
 In pursuit of this point, the Commission advances two areas of discretion as dispositive of this case. First it asserts that its pre-emption should be affirmed because an agency, and perhaps especially the FCC,[98] is entitled to great deference in the construction of its own statute.[99] While we do not quarrel with the general proposition, which has been affirmed several times in the courts,[100] we hasten to add that it is not a license to construe statutory language in any manner whatever, to conjure up powers with no clear antecedents in statute or judicial construction, nor to ignore explicit statutory limitations on Commission authority.
 
 
 61
 Set out above are our reasons for concluding that the action presently under attack does not fall within Midwest's farthest outpost of Commission authority over cable, even absent the applicability of 47 U.S.C. § 152(b). However one may view our limited conclusion on that point, though, it appears clear beyond doubt that the plain meaning of § 152(b) takes the case outside of any area of deference to agency interpretation which might properly be recognized.
 
 
 62
 This court has previously held that the term "common carrier" has a coherent legal meaning which courts can grasp and apply in reviewing the Commission construction of its own Act.[101] The clear content of that term as developed at common law and discussed in our previous N.A.R.U.C. opinion[102] indicates that most or all of the two-way, non-video cable operations at issue here do fit within the common carrier concept. Because at least the bulk of those activities are also clearly intrastate, we cannot avoid the conclusion that the § 152(b) jurisdictional bar clearly applies, beyond any margin for deference or discretion. To reach another result, in the absence of conflict with a countervailing grant of Commission power, would be to read § 152(b) out of the Act.
 
 
 63
 Secondly, the Commission argues that the challenged pre-emption falls within its especially broad discretion to encourage new and innovative technological developments, especially during an interim period.[103] The Commission stresses the newness of cable technology, its desire to formulate a scheme of regulation which will make possible the most effective development and widest use of cable, and the temporary, experimental nature of its present pre-emption decision. It thus seeks to bring that decision within an asserted statutory mandate for wideranging experimentation on an interim basis.
 
 
 64
 There is precedent for the proposition that the Commission has broad experimental powers.[104] However that authority to experiment arises from statutory language within the Communications Act titles dealing with common carriers[105] and radio broadcasting[106] We do not conclude from this that there is no statutory tolerance for experimentation unless Commission jurisdiction arises directly by application of one of those two titles. Rather, it seems logical to conclude that the powers over cable which have been recognized under § 152(a), as ancillary to the powers over broadcasting, embody a substantial scope for experimentation.
 
 
 65
 However, we find no basis whatever for the view that the statutory experimentation power can ever serve as an independent statutory foundation for bringing activities within FCC jurisdiction. The authority to experiment broadens the Commission's freedom to promulgate innovative and perhaps speculative regulations of activities over which it otherwise exercises regulatory jurisdiction. It does not, however, give the Commission power to regulate activities experimentally, where the statute, as construed broadly, does not confer a power to regulate in a non-experimental way.
 
 
 66
 It follows, thus, that the Commission's alleged experimental purpose in pre-empting state agency action can not save this regulation, where, as we have held, the Commission lacks general jurisdiction over the two-way cable communications involved. It matters not whether we or the FCC believe that one national laboratory would be better than 50 separate schemes of regulation. Congress has dictated that the particular type of activities at issue are to be regulated as the states see fit.
 
 
 67
 B. What is the impact of American Civil Liberties Union v. FCC?
 
 
 68
 In American Civil Liberties Union v. FCC,[107] the United States Court of Appeals for the Ninth Circuit recently determined that the Commission is not required to regulate cable access channelling under its Title II common carrier provisions,[108] and, in so doing, upheld the Commission's regulations[109] of such access channelling. This opinion arguably supports the Commission's position in two ways. Read most broadly, it is an affirmance of the entire regulatory scheme pertaining to access channelling, and thus implicitly upholds the pre-emption action at issue here. More specifically, the language of the opinion may be read to imply that no access channel operations need be regarded as common carrier activities for any purpose, so that § 152(b) need not be seen as applicable to our case. In order to determine the degree of support the opinion lends on either theory, we must examine the issues involved more closely.
 
 
 69
 The case presents an attempt by the ACLU to compel affirmative regulation of all access channelling by the FCC under its Title II common carrier provisions. Petitioners saw those provisions as a way of securing protection against discrimination and unreasonable rates and profits, and of guaranteeing access "upon reasonable request therefor."[110] Thus the case logically reduces to the issues of whether all access channel transmissions must be regarded as common carrier activities, and if so, whether the Commission is obligated to apply to them the affirmative regulations set forth in Title II. The Ninth Circuit appears to have dealt with the two issues together, and concluded that no such affirmative obligation exists.
 
 
 70
 The opinion exhibits no awareness of the peculiar breed of two-way leased access cable communication which is before this court. While it states in general terms that the Commission's general approach to access channelling is affirmed, there is no indication that the court at any time considered the nature of two-way, non-video leased access communications as distinguished from public, education, and governmental access programming. Nor is there any reason why it should have. Petitioner's concern was with common carrier regulation of conventional transmission access programming which was, and continues to be, the vastly dominant use of access channelling. On this basis, we see no reason to view anything in the opinion as a considered analysis of the type of communications before us.
 
 
 71
 More fundamentally, even if we regarded the court as embodying within its holding the two-way use of access channelling, its decision would be inapposite to our case. The primary issue there posed was the presence or absence of a statutory duty to implement the affirmative regulations set out in Title II.[111] Nowhere does the court address itself to the separate issue of the Commission's pre-emption of any state common carrier or other regulation.[112] A holding that the Commission had discretion to refuse to exercise its common carrier regulatory powers does not compel the conclusion that it also has discretion to pre-empt state common carrier regulation.[113] It therefore follows that the Ninth Circuit has not decided, either explicitly or implicitly, the pre-emption issue before us.
 
 IV. Summary
 
 72
 The Commission's asserted pre-emption of state and local regulation of two-way, intrastate, non-video cable transmissions is set aside. Insofar as most of those activities partake of a common carrier character, the order violates the clear bar to Commission jurisdiction of 47 U.S.C. § 152(b). It thus cannot fall within the § 152(a) delegation of powers reasonably ancillary to broadcasting. Even as to that narrow range of two-way cable communications which may not be non-common carrier in nature, we conclude, on the information before us, that the regulation does not come within the ancillariness standard as set out in Midwest.
 
 
 73
 So ordered.
 
 LUMBARD, Circuit Judge (concurring):
 
 74
 I concur in the conclusion that regulations governing cable system leased access channels that provide two-way, point-to-point, non-video communications are not "reasonably ancillary to the effective . . . regulation of television broadcasting," United States v. Southwestern Cable Co., 392 U.S. 157, 178, 88 S.Ct. 1994, 2005, 20 L.Ed.2d 1001, 1016 (1968). Accordingly, I would vacate the order of the F.C.C. of December 5, 1974, which preempts regulation of such leased access channels as set forth in the F.C.C.'s Clarification adopted April 15, 1974. As that determination is dispositive of the question of F.C.C. jurisdiction, I think it is unnecessary to reach the question of whether the F.C.C. is deprived of jurisdiction under 47 U.S.C. § 152(b) because these activities are performed by common carriers or are solely intrastate in character.
 
 
 75
 This circuit has previously recognized that cable television systems, which most certainly were not considered during the development of the Communications Act of 1934, are not "readily encompassed within the clear language of" the provisions of that Act which govern broadcasters or carriers. General Telephone Co. of California v. F. C. C., 134 U.S.App.D.C. 116, 413 F.2d 390, 405, cert. denied, 396 U.S. 888, 90 S.Ct. 173, 24 L.Ed.2d 163 (1969). See Philadelphia Television Broadcasting Co. v. F. C. C., 123 U.S.App.D.C. 298, 359 F.2d 282 (1966). The difficulty of trying to fit the activities of cable system operators, including those activities now in dispute, into niches for which they were not designed is borne out by the tentative nature of Judge Wilkey's conclusion that "most, if not all, of the uses to which the two-way, non-video cable capability is likely to be put fall within the term carrier . . . ."
 
 
 76
 Additional difficulties undermine my brother Wilkey's conclusion that operators who perform these activities are carriers. The activities in dispute are said to satisfy the requirement that carriers serve all persons indifferently because the F.C.C. has ordered that leased access channels be made available on a nondiscriminatory basis. If in fact these are carrier activities, however, then the F.C.C. had no jurisdiction to promulgate that order in the first place, and its dicta cannot be used in support of the proposition that cable operators who perform these functions act as common carriers.
 
 
 77
 The Supreme Court's decision to define F.C.C. jurisdiction over cable operators in terms of its jurisdiction over television broadcasting emanated from a finding that the two operations would otherwise conflict rather than from a determination that cable television fit neatly within the Communications Act provisions governing broadcasters. The Court implied that cable television had "characteristics both of broadcasting and of common carriers, but with all of the characteristics of neither . . . ." 392 U.S. at 172-78, 88 S.Ct. at 2002, 20 L.Ed.2d at 1013. Thus, I see no need to attempt to classify even these specific activities as clearly within or without the common carrier exemption from F.C.C. jurisdiction.
 
 
 78
 Nor is a determination that the activities in dispute are solely intrastate in nature conclusive on the question of the F.C.C.'s preemptive power. It seems clear that those cable television activities that are ancillary to television broadcasting, which is undoubtedly interstate in character, become, by that fact alone, subject to F.C.C. jurisdiction despite the possibility that all acts performed by the cable operators occur within the confines of a single state. Cf. General Telephone Co. of California v. F. C. C., 134 U.S.App.D.C. 116, 413 F.2d 390, cert. denied, 396 U.S. 888, 80 S.Ct. 173, 24 L.Ed.2d 163 (1969).
 
 
 79
 Thus it seems clear to me that presently the only relevant standard for determining whether the F.C.C. may properly exercise jurisdiction over an activity performed by a cable television operator is the standard set forth in Southwestern Cable of whether it is "ancillary to the regulation of television broadcasting." See United States v. Midwest Video Corp., 406 U.S. 649, 662-63, 92 S.Ct. 1860, 1867, 32 L.Ed.2d 390, 400 (1972). While the F.C.C. might be empowered to issue the challenged regulations if the broader standards for exercise of F.C.C. jurisdiction suggested by Judge Wright were the applicable criteria, I believe the Supreme Court has limited our scope of review to application of the "ancillary to television broadcasting" standard. I do not believe that any of the nexi suggested by the F.C.C. to exist between two-way point-to-point, non-video communications and traditional concepts of television broadcasting satisfy this criterion.
 
 
 80
 The F.C.C. first argues that cable television is an "organic whole" and thus implies that if one service performed by cable operators is subject to F.C.C. jurisdiction under the "ancillary to television broadcasting" standard, then all cable services are so subject. I think that Judge Wilkey has adequately demonstrated that there is neither logical nor statutory support for this proposition and that the Supreme Court opinions on the subject strongly suggest that there are limits to F.C.C. jurisdiction over cable operators. I would only add that the F.C.C.'s contention that it should have plenary power over cable operators performing the activities in dispute for fear that divided regulation would be administratively infeasible is belied by current practice. Services of exactly the same nature as several of the proposed two-way, point-to-point, non-video cable communications are presently performed by telephone companies which are subject to state and local regulation. Yet the F.C.C. has introduced no evidence of administrative confusion as a result of diverse regulation by these entities.
 
 
 81
 Second, the F.C.C. argues that it desires to preempt the field, and thereby prevent any regulation of these services, in order to encourage experimentation with cable facilities. The laudatory desire to encourage experimentation, however, does not give the F.C.C. jurisdiction in the absence of a showing that the results of the experiment would be ancillary to broadcasting. I agree with Judge Wilkey that the nature of these services is such that its impact on broadcasting will be minimal. Moreover, many of these "new" services are, as noted above, presently supplied by telephone companies that are subject to state regulation. There is no reason to believe that states, which have allowed these services to develop in this context, would be less responsive to experimentation in the area of cable television.
 
 
 82
 Finally, the F.C.C. and those intervening on its behalf attempt to demonstrate an economic link between two-way, point-to-point, non-video communications and broadcasting services. Intervenor Manhattan Cable Television[1] thus notes that it has accumulated substantial losses in providing cable television services but that its revenue-cost imbalance has been improved by its leasing of two-way, point-to-point, non-video communications services. It thus has the opportunity to present more broadcasting than it could otherwise afford. The F.C.C. apparently fears, without any substantiation of its claim, that a plethora of state regulations would deter cable operators from undertaking the expense necessary to institute these systems. Even if this economic nexus between broadcasting and the disputed services was sufficient to satisfy the "ancillariness" standard, a proposition which would far exceed the "ancillariness" found in any previous case, the F.C.C.'s contention is based on pure conjecture. One may just as well speculate that state regulations will be designed to encourage implementation of these services and not to make them economically infeasible.
 
 
 83
 For these reasons I agree that the order should be vacated and set aside.
 
 
 84
 J. SKELLY WRIGHT, Circuit Judge (dissenting):
 
 
 85
 Congress created the Federal Communications Commission to protect the public interest in the development of an electronic communications system. Since "Congress was acting in a field of regulation which was both new and dynamic (,)" it gave the Commission "not niggardly but expansive powers(,)" National Broadcasting Co. v. United States, 319 U.S. 190, 219, 63 S.Ct. 997, 1010, 87 L.Ed. 1344, 1364 (1943), sufficient to respond to changes in technology in the absence of corresponding changes in the statutory framework. See, e. g., General Telephone Co. v. FCC, 134 U.S.App.D.C. 116, 124, 413 F.2d 390, 398, cert. denied, 396 U.S. 888, 90 S.Ct. 173, 24 L.Ed.2d 163 (1969). Although originally hesitant,[1] the Commission has in recent years concluded that it is authorized to shape the growth of cable television in accordance with the national goal of "mak(ing) available, so far as possible, to all the people of the United States a rapid, efficient, Nation-wide, and world-wide wire and radio communication service with adequate facilities at reasonable charges (.)" 47 U.S.C. § 151 (1970). The courts have approved the commission's view of its power. E. g., United States v. Midwest Video Corp., 406 U.S. 649, 92 S.Ct. 1860, 32 L.Ed.2d 390 (1972); United States v. Southwestern Cable Co., 392 U.S. 157, 88 S.Ct. 1994, 20 L.Ed.2d 1001 (1968); General Telephone Co. v. FCC, supra.
 
 
 86
 I cannot agree with Judges Lumbard and Wilkey that the Commission has exceeded its authority by asserting preemptive jurisdiction over the category of cable television activities petitioners artfully designate as "intrastate two-way point-to-point non-video communications services for hire." Accordingly, I respectfully dissent.
 
 I. BACKGROUND
 
 87
 The present proceeding has its origin in a series of notices of proposed rule makings issued by the Commission from 1968 through 1970.[2] The rule makings set in motion by these notices dealt with various aspects of the regulation of cable television, including "the appropriate division of regulatory jurisdiction between the federal and state and local levels of government * * *." Cable Television Report and Order (hereinafter Report and Order ), 36 FCC 2d 143, 144, reconsidered in part, 36 FCC 2d 326 (1972). Following an unusually "full and open exploration of issues," Price, Requiem for the Wired Nation: Cable Rulemaking at the FCC, 61 Va.L.Rev. 541 (1975), the Commission sent to Congress and made public a detailed description of the conclusions it had reached. Commission Proposals for Regulation of Cable Television, 31 FCC 2d 115 (1971) ("letter of intent" addressed to Senator McClellan). In February 1972, six months after it released the letter of intent, the Commission incorporated its conclusions in regulations issued with the Report and Order.
 
 
 88
 These regulations required, inter alia, that cable systems operating[3] in the 100 largest television markets possess a "technical" capacity for two-way transmission of nonvoice communications[4] and make available "access" channels for transmission of nonbroadcast programming. Each system was compelled to designate separate channels for public, educational, and governmental access. All remaining channels were to be made available for leased access. See 47 C.F.R. § 76.251 (1975).
 
 
 89
 In the Report and Order the Commission explained the rationale of the access rules:
 
 
 90
 117. In its Notice of Proposed Rulemaking in Docket 18894, the Commission stated that:
 
 
 91
 Cable television offers the technological and economic potential of an economy of abundance.
 
 
 92
 On the basis of the record now assembled, we believe the time has come for cable television to realize some of that potential within a national communications structure. We recognize that in any matter involving future projections, there are necessarily certain imponderables. These access rules constitute not a complete body of detailed regulations but a basic framework within which we may measure cable's technological promise, assess its role in our nationwide scheme of communications, and learn how to adapt its potential for energetic growth to serve the public.
 
 
 93
 36 FCC 2d at 189 (footnote omitted). Cable television was required to fulfill this public function in return for the Commission's permission to utilize broadcast signals:
 
 
 94
 We emphasize that the cable operator cannot accept the broadcast signals that will be made available without also accepting the obligation to provide the nonbroadcast bandwidth and the access services described below. The two are integrally linked in the public interest judgment we have made.
 
 
 95
 Id. at 190. The Report and Order also explained the Commission's decision to limit state and local regulation of all access services, including those provided on leased channels:[5]
 
 
 96
 130. We now turn to the question of the regulation of access channels presenting nonbroadcast programming. We believe that such regulation is properly the concern of this Commission. These channels fulfill Communications Act purposes and, in the context of our total program, are integrally bound up with the broadcast signals being carried by cable. It is by no means clear that the viewing public will be able to distinguish between a broadcast program and an access program; rather, the subscriber will simply turn the dial from broadcast to access programming, much as he now selects television fare. Moreover, leased channels will undoubtedly carry interconnected programming via satellite or interstate terrestrial facilities, matters that are clearly within the Commission's jurisdiction. * * *
 
 
 97
 131. There remains the issue of whether also to permit state or local regulation of these channels where not inconsistent with federal purposes. We think that in this area a dual form of regulation would be confusing and impracticable. Our objective of allowing a period for experimentation might be jeopardized if, for example, a local entity were to specify more restrictive regulations than we have prescribed. Thus, except for the government channel, local regulation of access channels is precluded. If experience and further proceedings indicate its need or desirability, we can then delineate an appropriate local role.
 
 
 98
 Id. at 193 (emphasis added; footnote omitted). Petitioners did not seek reconsideration or judicial review of the Report and Order.
 
 
 99
 The Report and Order thus expressed three themes which have dominated the Commission's approach to access channel regulation: (1) the relationship between the benefits received by cable systems from their use of broadcast signals and the potential role of cable in the national communications network; (2) federal preemption of regulatory jurisdiction in order to ensure unhindered development of cable services; and (3) the tentative, experimental nature of the Commission's actions. In keeping with this recognition of the tentativeness of its regulatory program, the Commission also announced that it was establishing a Federal-State/Local Advisory Committee (FSLAC):
 
 
 100
 Further, because we expect significant development in cable television as a result of our action today, the Commission will seek the advice of a special committee composed of representatives of federal, state, and local governments, the cable industry, and public interest groups. This committee will aid the Commission as it attempts to define an appropriate allocation of responsibilities in cable regulation.
 
 
 101
 Id. at 210. After many months of study, including more than 250 hours of public meetings,[6] the FSLAC steering committee submitted a final report to the Commission.[7] The Commission's initial reactions to the FSLAC report were announced in the Clarification of the Cable Television Rules and Notice of Proposed Rulemaking and Inquiry (hereinafter Clarification ) issued in April 1974. 46 FCC 2d 175, JA 1.
 
 
 102
 The Clarification began with a statement of the Commission's policy of frequently revising its rules to accommodate the rapid pace of change in the cable industry. See 46 FCC 2d at 176-177, JA 3-4. It also emphasized the broad purposes of the Commission's regulation of cable:
 
 
 103
 21. Our interest in the development of cable television is not passive. While the bedrock of our regulatory authority over cable clearly derives from its use of broadcast signals (see U. S. v. Southwestern Cable Co., 392 U.S. 157, (88 S.Ct. 1994, 20 L.Ed.2d 1001), Midwest Video v. U. S. (,) 406 U.S. 649, (92 S.Ct. 1860, 32 L.Ed.2d 390)), this is not where our concern ends. This Commission is primarily responsible for the development and maintenance of a nationwide communication system (Communications Act of 1934 As Amended, Sec. 1). Cable television is undeniably part of that system and presumably will become a major and integrally vital element of what many see as the broadband communications system of the future. We are concerned that we do not, in our efforts to mold the communications structure of the future, unduly hamper the developing structure of today. Over-expectation and anticipatory regulation can be just as damaging, if not more damaging, than no regulation at all.
 
 
 104
 46 FCC 2d at 176, JA 3. In order to assure that the growth of cable would not be hindered by unnecessary rate regulation, the Commission reiterated that it had preempted that area:
 
 
 105
 32. It is too early to discern any trends regarding our leased access channel rules (Section 76.251(a)(7)). It remains our intent to keep these channels as free as possible from any regulation that might restrict or artificially alter their growth. This is particularly true in the area of rate regulation. We have pre-empted this area with the explicit purpose of allowing the market place to function freely. We note that many authorities are already talking about regulating leased channel rates and/or rates for pay cable services. It is premature to regulate along these lines. Such regulation might destroy any chance for this emerging communications service by stifling competition, setting incorrect rates, and establishing an atmosphere which deters experimentation, innovation, or speculation. We have pre-empted this area to avoid those pitfalls. It is unclear how a regulatory body could now establish reasonable rates for services that are untested, unproven, and which have not even established a consistent record as to costs, expenses, subscription, etc.
 
 
 106
 33. * * * (D)ual jurisdictional regulation of access channels would cause great confusion and might inhibit their growth on a nationwide basis. Different regulation, rate structures, etc., for instance, on channels where a per program or per channel charge is made might unduly hamper the obviously interstate effort involved by cable operators and programmers to secure a large enough audience to make this new communications medium a viable economic success. We cannot allow such a multiplicity of regulation to detract from our national program.
 
 
 107
 46 FCC 2d at 185-186, JA 15 (emphasis added). See also 46 FCC 2d at 199-200, JA 30-31. The Commission also repeated its promise to monitor developments in the industry and to change its policies if appropriate. See, e. g., 46 FCC 2d at 186 & n.5, 200, JA 16 & n.5, 31.
 
 
 108
 Petitioners sought reconsideration of the Clarification,[8] arguing primarily that the Commission's preemption of rate regulation of all leased channel services was not merely a "clarification" of previous rulings but rather was substantive rule making in violation of the Administrative Procedure Act.[9] That argument is not pressed here. In addition, petitioners claimed that the Commission does not have authority to preempt regulation of "non-programing use of leased access channels that otherwise constitutes for-hire intrastate communication service subject to State regulatory jurisdiction."[10]
 
 
 109
 The Commission denied reconsideration in Memorandum Opinion and Order (hereinafter Memorandum Opinion ), 49 FCC 2d 1078, JA 60 (1974). After refuting the contention that prior to issuing the Clarification the Commission had not clearly indicated that nonfederal rate regulation of all leased channel services was preempted, the Memorandum Opinion noted that "objections relating to such a ruling are not timely. All parties had ample opportunity to comment on and object to our rules when they were adopted in February 1972. The particular parties did not do so." 49 FCC 2d at 1081, JA 64. Nevertheless, the Commission responded to the jurisdictional arguments.
 
 
 110
 The Memorandum Opinion rejected petitioners' attempt to isolate a carefully defined segment of cable services:
 
 
 111
 11. In our regulatory actions regarding cable television, we have maintained that the services of cable are indivisible. The jurisdiction recognized by the Supreme Court in Southwestern (United States v. Southwestern Cable Co., 392 U.S. 157, 88 S.Ct. 1994, 20 L.Ed.2d 1001 (1968)) as "ancillary to broadcasting" does not cease at the point cable becomes involved in intrastate point-to-point non-video communications. * * *
 
 
 112
 49 FCC 2d at 1082, JA 66. Cable services are indivisible because of the relationship among cable's use of broadcast signals, nonbroadcast cable services, and the role of cable in furthering the broad objectives of the Communications Act:
 
 
 113
 12. We have repeatedly stated that the prospects for the development of a nationwide broadband communications grid by cable are inextricably tied to a nationwide regulatory program constituting a delicate and difficult intermix of benefits to cable and services required of it. The principal benefit, at this time, is the carriage of broadcast signals. The required services include the access channels and two-way data-grade capacity. * * *
 
 
 114
 14. The same interdependencies and necessity for uniform regulation apply to the non-video aspects of cable television transmission as well as the video portion. Petitioners would have us read Section 2(b) of the Act to exclude from our regulatory framework only non-video, intrastate activities of cable television. We cannot accept such a narrow reading of the Communications Act and neither have the courts. * * * That cable is an "organic whole" should be obvious. Without the broadcast signal complement allowed by our rules, there would be no cable. It is also becoming clear to this Commission that without the additional services including leased access, either mandated or allowed by our rules, cable will not be able to develop a strong enough package of services to achieve our goal of a nationwide broadband communications grid. Were we to allow numerous different jurisdictional authorities to impose additional or different regulations in this area, it would frustrate our overall regulatory scheme. * * *
 
 
 115
 49 FCC 2d at 1082-1083, JA 66-68 (footnote omitted). The Commission also stated that Section 152(b) does not apply because cable systems are not "carriers." 49 FCC 2d at 1082, JA 65. Petitioners sought review in this court.
 
 
 116
 II. THE COMMISSION'S JURISDICTION UNDER SECTION 152(a)
 
 A. The Appropriateness of Deference
 
 117
 Had the Commission chosen to do so, it could have dismissed petitioners' request for reconsideration as untimely. See 47 C.F.R. § 1.106 (1974); Valley Telecasting Co. v. FCC, 118 U.S.App.D.C. 410, 336 F.2d 914 (1964). Instead, the Commission decided to consider the merits of petitioners' position. That decision does not, however, render irrelevant the lengthy history which I have set forth in the preceding section. The intensity of our review should reflect our recognition that the order challenged here draws on a lengthy process of policy development by the Commission.[11]
 
 
 118
 It is a "venerable principle that the construction of a statute by those charged with its execution should be followed unless there are compelling indications that it is wrong * * *." Red Lion Broadcasting Co. v. FCC, 395 U.S. 367, 381, 89 S.Ct. 1794, 1802, 23 L.Ed.2d 371, 384 (1969). The fact that the Commission's view of its authority was the product of "much study" gives added weight to this principle. See General Telephone Co. v. FCC, supra, 134 U.S.App.D.C. at 127, 413 F.2d at 401. Similarly, that the Commission reported its conclusions to Congress six months before issuing the Report and Order, and that Congress did not reject the Commission's broad assertion of power, should increase our hesitancy to reverse the Commission's construction of the Communications Act. See Red Lion Broadcasting Co. v. FCC, supra, 395 U.S. at 381, 89 S.Ct. 1794.
 
 
 119
 The history of the Memorandum Opinion should also affect our approach to review of the factual premises on which it rests. When drafting its response to petitioners' belated challenge to the Report and Order, the Commission was certainly entitled to assume the factual knowledge it had developed during the three years of rule making leading to publication of that document. The Commission was also entitled to rely on the experience it has gained since the preemptive regulations were first promulgated. In view of this background, we should be unusually loath to dismiss as unfounded the Commission's factual assertions. Moreover, the parties did not raise factual issues before the Commission, they have not addressed their briefs to factual questions, and this court has not reviewed the presumably voluminous record generated by the many years of rule making which preceded the Memorandum Opinion we now set aside. In these circumstances, I believe it is improper for us to engage in any review of factual findings.[12] At the least, all doubtful questions should be resolved in the Commission's favor.
 
 
 120
 In addition, our review should take cognizance of the Commission's statutorily imposed duty to experiment with new techniques of communication. See 47 U.S.C. §§ 218, 303(g) (1970). This authority has been consistently recognized by this court as a significant aspect of Congress' purpose in establishing the Commission. See, e.g., United Telegraph Workers v. FCC, 141 U.S.App.D.C. 190, 193-194, 436 F.2d 920, 923-924 (1970); Connecticut Committee Against Pay TV v. FCC, 112 U.S.App.D.C. 248, 250-251, 301 F.2d 835, 837-838, cert. denied, 371 U.S. 816, 83 S.Ct. 28, 9 L.Ed.2d 57 (1962). Since the decision to experiment must necessarily be based on a prediction, "the court's inquiry into the factual underpinnings of agency action authorizing a temporary program or giving it interim approval will appropriately be less searching tha(n) if (it) were faced with the institution of a permanent program." United Telegraph Workers v. FCC, supra, 141 U.S.App.D.C. at 196, 436 F.2d at 926. Thus, for example, we should not demand that the Commission prove that two-way communication will be an important source of revenue for cable systems before allowing it to undertake an experimental program based on that premise.[13]
 
 
 121
 B. The Legal Standard for Determining Jurisdiction Under Section 152(a)
 
 Section 152(a) provides in pertinent part:
 
 122
 The provisions of this chapter shall apply to all interstate and foreign communication by wire or radio * * * and to all persons engaged within the United States in such communication * * *.
 
 
 123
 Judge Wilkey labels this section "quite general and * * * not unambiguously jurisdictional in character." Wilkey op. at ---- of --- U.S.App.D.C., at 612 of 533 F.2d. He concludes that the jurisdictional grant which the Supreme Court has discerned in Section 152(a) "is really incidental to, and contingent upon, specifically delegated powers under the Act." Id. Judge Lumbard concurs in this conclusion, and also agrees that the Commission's preemption of state regulation cannot be considered "reasonably ancillary" to the Commission's powers over broadcasting. I do not believe that either the language or the reasoning of the relevant Supreme Court opinions justifies such a restrictive understanding of Section 152(a).
 
 
 124
 In United States v. Southwestern Cable Co., supra, 392 U.S. at 167, 88 S.Ct. at 2000, 20 L.Ed.2d at 1010, the Supreme Court began its analysis by identifying the source and purpose of the Commission's power to regulate:
 
 
 125
 The Commission's authority to regulate broadcasting and other communications is derived from the Communications Act of 1934, as amended. The Act's provisions are explicitly applicable to "all interstate and foreign communications by wire or radio. . . ." 47 U.S.C. § 152(a). The Commission's responsibilities are no more narrow: it is required to endeavor to "make available . . . to all the people of the United States a rapid, efficient, Nation-wide, and world-wide wire and radio communication service. . . ." 47 U.S.C. § 151. * * *
 
 
 126
 The Court explicitly rejected the contention, similar to Judge Wilkey's analysis, that Section 152(a) "does not independently confer regulatory authority upon the Commission, but instead merely prescribes the forms of communication to which the Act's other provisions may separately be made applicable." Id. at 171-172, 88 S.Ct. at 2002, 20 L.Ed.2d at 1013. The Court's language is instructive:
 
 
 127
 We cannot construe the Act so restrictively. Nothing in the language of § 152(a), in the surrounding language, or in the Act's history or purposes limits the Commission's authority to those activities and forms of communication that are specifically described by the Act's other provisions. * * * We have found no reason to believe that § 152 does not, as its terms suggest, confer regulatory authority over "all interstate . . . communication by wire or radio."
 
 
 128
 Id. at 172-173, 88 S.Ct. at 2002, 20 L.Ed.2d at 1013 (footnote omitted).
 
 
 129
 Only after reaching this conclusion did the Southwestern Cable Court note that "the Commission has reasonably concluded that regulatory authority over (cable) is imperative if it is to perform with appropriate effectiveness certain of its other responsibilities." Id. at 173, 88 S.Ct. at 2003, 20 L.Ed.2d at 1014 (emphasis added). Although the Court then limited its specific holding to the facts of the Southwestern Cable situation by emphasizing that it had recognized only "authority * * * reasonably ancillary to the effective performance of the Commission's various responsibilities for the regulation of television broadcasting," id. at 178, 88 S.Ct. at 2005, 20 L.Ed.2d at 1016, it said nothing to cast doubt on its earlier conclusion concerning Section 152(a). Moreover, the Court did not indicate that only the Commission's concern with broadcasting, among all of its "other responsibilities," could justify the exercise of Section 152(a) jurisdiction.
 
 
 130
 Southwestern Cable has been generally read as recognizing Section 152(a) as an independent basis for Commission jurisdiction over cable. See, e.g., General Telephone Co. v. United States, 449 F.2d 846, 853-854 (5th Cir. 1971); TV Pix, Inc. v. Taylor, 304 F.Supp. 459, 465 (D.Nev.1968) (three-judge court) (dictum), affirmed per curiam, 396 U.S. 556, 90 S.Ct. 749, 24 L.Ed.2d 746 (1970); Barnett, State, Federal, and Local Regulation of Cable Television: An Analysis of the New FCC Rules, 1971 Duke L. J. 1151, 1166-1167. More importantly, the Supreme Court plurality in United States v. Midwest Video Corp., supra, 406 U.S. at 660, 92 S.Ct. at 1867, 32 L.Ed.2d at 398, stated that in Southwestern Cable "(w)e also held that § (15)2(a) is itself a grant of regulatory power and not merely a prescription of the forms of communication to which the Act's other provisions governing common carriers and broadcasters apply."
 
 
 131
 The Midwest Video Court recognized that Southwestern Cable established a two-step analysis for reviewing an assertion of authority founded on Section 152(a). First, it is necessary to determine whether the subject matter over which the Commission claims authority is within the language of the statute. Second, the court must determine whether the assertion of authority is "reasonably ancillary" to the Commission's responsibilities, "for § (15)2(a) does not in and of itself prescribe any objectives for which the Commission's regulatory power over (cable) might properly be exercised." 406 U.S. at 661, 92 S.Ct. at 1867, 32 L.Ed.2d at 399. The "reasonably ancillary" determination is made by considering whether the Commission's view of the challenged regulation's relationship to statutory goals is reasonable. This two-step analysis was used in Midwest Video to determine jurisdiction, see id. at 661-670, 92 S.Ct. 1860, and I believe we should follow the same analysis here. After determining the Commission's jurisdiction, it may then be appropriate to review the evidentiary foundation for the Commission's conclusions. See id. at 671-675, 92 S.Ct. 1860.
 
 
 132
 Before beginning this analysis, however, it is important to note that the Midwest Video precedent is not as fragile as my brethren appear to believe. It is of course true that the Chief Justice, whose vote determined the outcome in Midwest Video, expressed his feeling that "the Commission's position strains the outer limits of even the open-ended and pervasive jurisdiction that has evolved by decisions of the Commission and the courts." Id. at 676, 92 S.Ct. at 1874, 32 L.Ed.2d at 407. Yet this expression of doubt was sandwiched among paragraphs explaining the need to allow the Commission "wide latitude" in the absence of congressional action to accommodate the terms of the Communications Act to new developments in the field of communications. Moreover, the decisive factor for the Chief Justice was that cable systems are "dependent totally on broadcast signals * * *." Id. at 675, 92 S.Ct. 1860. By "interrupt(ing) the signal and put(ting) it to their own use for profit, they take on burdens, one of which is regulation by the Commission." Id. at 676, 92 S.Ct. at 1874, 32 L.Ed.2d at 407. In our case, as in Midwest Video, the Commission's rules, and the preemptive assertion of jurisdiction which accompanies them, are considered "burdens" which the cable operators must accept in return for the benefit of being allowed to utilize broadcast signals. See, e.g., Memorandum Opinion, 49 FCC 2d at 1082-1083, JA 66.
 
 
 133
 Similarly, the position of the four dissenters in Midwest Video does not suggest that they would reject the Commission's position in this case. The central objection of the Midwest Video dissenters was that the Commission had exceeded its authority by promulgating program origination rules under which "a person may be compelled to enter the broadcasting or cablecasting field." 406 U.S. at 679, 92 S.Ct. at 1876, 32 L.Ed.2d at 409. Since the Commission was not authorized by any provision in its legislation to compel someone to become a broadcaster, upholding the rule would "make the Commission's authority over activities 'ancillary' to its responsibilities greater than its authority over any broadcast licensee." Id. at 681, 92 S.Ct. at 1877, 32 L.Ed.2d at 410. This objection cannot be made against the preemptive regulation challenged here. The Commission is not seeking to impose on cable operators (or state regulatory commissions) a regime that would be beyond the Commission's authority to impose on broadcasters. See National Ass'n of Regulatory Utility Comm'rs v. FCC, --- U.S.App.D.C. ---, ---, 525 F.2d 630, 646 (1976); cf. TV Pix, Inc. v. Taylor, supra, 304 F.Supp. at 465.
 
 
 134
 C. Application of the Jurisdictional Standard
 
 
 135
 1. The Section 152(a) Threshold : Applying the analysis developed in Southwestern Cable and refined in Midwest Video, the first question is whether the activities at issue here come within the scope of Section 152(a). Since "communication by wire" is clearly involved, the only question is whether the "interstate" criterion of Section 152(a) is satisfied. By limiting their challenge to "intrastate two-way point-to-point non-video communication services for hire," petitioners have attempted to avoid Section 152(a). Petitioners' effort might succeed if it were true that two-way, point-to-point nonvideo communication over cable networks located entirely in a single state, see Wilkey op. at ---- of --- U.S.App.D.C., at 610 of 533 F.2d, would always involve only intrastate communication. It is apparently not true, however, and Midwest Video therefore requires us to reject petitioners' contention.
 
 
 136
 In the Report and Order the Commission stated that "leased channels will undoubtedly carry interconnected programming via satellite or interstate terrestrial facilities * * * ." 36 FCC 2d at 193. Two-way capability over cable networks is expected to be used to link computers as instructional aids. Id. at 191. There is no reason why intrastate computer links established as part of such an endeavor might not be joined, through satellites or otherwise, with interstate links. Similarly, there is no apparent reason why the facilities used to link a citizen with his city council, see Wilkey op. at ---- of --- U.S.App.D.C., at 611 of 533 F.2d, might not be combined with other facilities to link a citizen with his Congress or with multistate regional bodies. Thus the services over which petitioners assert exclusive jurisdiction fall within Midwest Video's observation that "(t)he capacity for interstate nonbroadcast programming may in itself be sufficient to bring cablecasts within the compass of § (15)2(a)." 406 U.S. at 662 n. 21, 92 S.Ct. at 1868, 32 L.Ed.2d at 400. The Midwest Video Court explained:
 
 
 137
 In Southwestern we declined to carve CATV (cable) broadcast transmissions, for the purpose of determining the extent of the Commission's regulatory authority, into interstate and intrastate components. * * * This result was justified by the extent of interstate broadcast programing, the interdependencies between the two components, and the need to preserve " 'the unified and comprehensive regulatory system for the (broadcasting) industry.' " * * * A similar rationale may apply here, despite the lesser "interstate content" of cablecasts at present.
 
 
 138
 Id. at 662-663 n.21, 92 S.Ct. at 1868, 32 L.Ed.2d at 400 (emphasis added). I believe we should follow this suggestion.[14]
 
 
 139
 In Midwest Video the Court found it unnecessary to determine whether the interstate potential sufficed to support Commission jurisdiction under Section 152(a) because a clearer basis for jurisdiction existed. Since the Court's language is directly applicable to this case, I quote it at length:
 
 
 140
 * * * (I)n any event, CATV (cable) operators have, by virtue of their carriage of broadcast signals, necessarily subjected themselves to the Commission's comprehensive jurisdiction. * * * The devotion of CATV systems to broadcast transmission together with the interdependencies between that service and cablecasts, and the necessity for unified regulation plainly suffices to bring cablecasts within the Commission's § (15)2(a) jurisdiction. See generally Barnett, State, Federal, and Local Regulation of Cable Television, 47 Notre Dame Law. 685, 721-723, 726-734 (1972).
 
 
 141
 Id. at 663 n.21, 92 S.Ct. at 1868, 32 L.Ed.2d at 400. In Midwest Video this reasoning supported Section 152(a) jurisdiction over cable operators sufficient to require and regulate original cablecasts. In our case the use of broadcast signals is the basis for the Commission's requirement that leased channels be provided, and for the Commission's regulation of those channels. Here, too, the inter- and intrastate communications can take place over the same facilities and in response to the same regulation. I can only conclude that the jurisdiction found by the Midwest Video Court exists here as well.[15]
 
 
 142
 2. The "reasonably ancillary" Criterion : We must determine whether the Commission has "reasonably concluded" that the preemptive regulations will support "the effective performance of the Commission's various responsibilities * * * ." See page ---- of --- U.S.App.D.C., page 629 of 533 F.2d supra. It is important to note that this inquiry is distinct from the determination whether the Commission's conclusions of fact are adequately supported by the record. See United States v. Midwest Video Corp., supra, 406 U.S. at 663-675, 92 S.Ct. 1860. I will consider the latter question in Part IV of this opinion. Here, I am concerned solely with whether the nexus between the Commission's view of the effect of the challenged regulations and the Commission's statutory responsibilities is sufficient to justify the conclusion that this exercise of Section 152(a) jurisdiction is "reasonably ancillary" to performance of the Commission's functions under the Communications Act.
 
 
 143
 Bearing in mind the properly limited nature of our review, I believe we must find that the preemption of state regulation challenged here is ancillary both to the Commission's broadcasting responsibilities under Title III of the Communications Act, 47 U.S.C. § 301 et seq. (1970), and to its general statutory purposes as set forth in Section 1 of the Act, 47 U.S.C. § 151 (1970). As I indicated in Section C-1 supra, many of the expected, or at least potential, uses of the two-way, point-to-point, nonvideo capability of cable systems will involve distribution of signals which have been or will be broadcast interstate. Moreover, other uses, such as adding a feedback mechanism to locally originated or interstate cablecasts, are directly related to making television a more effective instrument of communication. For example, the ability of a citizen viewing a city council meeting to vote in an instantaneous referendum would transform television viewing from a passive to a participatory experience. This transformation would not only strengthen the democratic system, but would also "augment( ) the public's choice of programs and types of services. . . . " United States v. Midwest Video Corp., supra, 406 U.S. at 668, 92 S.Ct. at 1870, 32 L.Ed.2d at 403, quoting First Report and Order, 20 FCC 2d 201, 202 (1969) (emphasis added). Similarly, use of the return transmission capacity by "users to signal their wishes back up the cable and thus select particular programming or other information * * * ," Cabinet Committee on Cable Communications, Report to the President 9-10 (1974), is obviously related to improving the service offered to those who view cable television. Midwest Video leaves no doubt that regulations designed to encourage the creation of such services[16] are "reasonably ancillary" to the Commission's powers over broadcasting. See 406 U.S. at 667-670. The regulations challenged here are in that category. See, e. g., Clarification, supra, 46 FCC 2d at 199-200, JA 30-31.
 
 
 144
 Judges Lumbard and Wilkey read part of the Memorandum Opinion as basing jurisdiction on the conclusion that nonvideo services will provide an important source of profits to support the more traditionally "broadcasting" functions of cable.[17] My colleagues reject this Commission argument. Wilkey op. at ----, ---- - ---- of --- U.S.App.D.C., at 614, 616 of 533 F.2d; Lumbard op. at ---- of --- U.S.App.D.C., at 622-623 of 533 F.2d. To the extent this rejection is based on their view of the evidence, I will consider their position in Part IV of my opinion. Here, I simply note my disagreement with the suggestion, see Wilkey op. at ---- of --- U.S.App.D.C., at 616 of 533 F.2d, that even if the Commission's prediction is correct this "indirect" relationship might not be enough to sustain the claimed jurisdiction.[18] Cf. GTE Service Corp. v. FCC, 474 F.2d 724, 731 (2d Cir. 1973):
 
 
 145
 (E)ven absent explicit reference in the statute, the expansive power of the Commission in the electronic communications field includes the jurisdictional authority to regulate carrier activities in an area as intimately related to the communications industry as that of computer services, where such activities may substantially affect the efficient provision of reasonably priced communications service. * * *
 
 
 146
 In addition to being "reasonably ancillary" to broadcasting, the Commission's decision is "reasonably ancillary" to its responsibilities under Section 151, and should be sustained on that basis as well. Section 151 states that the Commission is established
 
 
 147
 (f)or the purpose of regulating interstate and foreign commerce in communication by wire and radio so as to make available, so far as possible, to all the people of the United States a rapid, efficient, Nation-wide, and world-wide wire and radio communication service with adequate facilities at reasonable charges * * * .
 
 
 148
 While the section does not grant the Commission any power, it does state objectives for the exercise of the jurisdiction granted by Section 152(a). United States v. Midwest Video Corp., supra, 406 U.S. at 669 n.28, 92 S.Ct. 1860. See also GTE Service Corp. v. FCC, supra, 474 F.2d at 730; TV Pix, Inc. v. Taylor, supra, 304 F.Supp. at 465. Furtherance of the objectives established by this section was one of the primary reasons the Commission gave for promulgating the challenged regulations. See generally Part I supra. My earlier discussion of some of the potential uses of cable's nonvideo and two-way capacities should suffice to demonstrate the relationship between encouraging unfettered growth of these services and provision of "a rapid, efficient, Nation-wide, and world-wide wire and radio communication service * * * ." Thus we must hold that the Commission has jurisdiction to issue the preemptive regulations because it "has reasonably concluded that regulatory authority over (cable) is imperative if it is to perform with appropriate effectiveness certain of its other responsibilities" set forth in Section 151. See page ---- of --- U.S.App.D.C., page 629 of 533 F.2d supra; cf. General Telephone Co. v. United States, supra, 449 F.2d at 854-855.
 
 III. THE IMPACT OF SECTION 152(b)
 
 149
 Section 2(b) of the Communications Act, 47 U.S.C. § 152(b), denies the Commission jurisdiction over "charges, classifications, practices, services, facilities, or regulations for or in connection with intrastate communication service by wire or radio of any carrier * * * ." Petitioners and Judge Wilkey agree that Section 152(b) deprives the Commission of jurisdiction over most "intrastate two-way non-video communications services for hire over cable." Judge Lumbard points to several substantial "difficulties" which "undermine" Judge Wilkey's analysis, and he does not join Judge Wilkey's conclusion on this issue. Lumbard op. at ---- of --- U.S.App.D.C., at 621-622 of 533 F.2d. Since I too reject the conclusion that Section 152(b) bars the Commission's assertion of jurisdiction, Judge Wilkey's views on this issue do not constitute the holding of this court.
 
 
 150
 I agree with Judge Lumbard's trenchant criticism of Judge Wilkey's analysis, and will add but a few words to explain my own position. I believe my discussion of the Commission's jurisdiction under Section 152(a) is largely dispositive of the contention that Section 152(b) governs this case.[19] To the extent the two-way services over which petitioners claim exclusive jurisdiction involve or may involve interstate communications, Section 152(b) is clearly inapplicable. General Telephone Co. v. United States, supra, 449 F.2d at 855 n.5. Moreover, to the extent that intrastate communications services are offered in connection with video transmissions, or may be expected to support provision of more effective "traditional" cable television services, Section 152(b) should be narrowly read to avoid frustrating the Commission's legitimate regulatory goals. Compare Lumbard op. at ---- of --- U.S.App.D.C., at 621 of 533 F.2d.
 
 
 151
 In addition, I note that by its own terms Section 152(b) appears not to govern this case. That section refers only to the intrastate services of "any carrier." The statute defines a "carrier" as
 
 
 152
 any person engaged as a common carrier for hire, in interstate or foreign communication by wire or radio or in interstate or foreign radio transmission of energy, except where reference is made to common carriers not subject to this chapter * * * .
 
 
 153
 47 U.S.C. § 153(h) (1970) (emphasis added). This definition has two elements: (a) common carriage (b) in interstate or foreign communication. Accepting arguendo Judge Wilkey's conclusion that the first aspect of the definition is satisfied, I nevertheless conclude that cable operators are not "carriers" within the meaning of Section 153(h) because the second part of the definition is not met.[20] It is undisputed that cable systems are not common carriers "in interstate or foreign communication * * * ." See United States v. Southwestern Cable Co., supra, 392 U.S. at 169 n.29, 88 S.Ct. 1994. Since cable systems are therefore not "carriers" under Section 153(h), the jurisdictional exclusion of Section 152(b)(1) does not apply to them.
 
 
 154
 This restrictive reading of Section 152(b) is supported by the legislative history of that section. The history shows that the section had the limited purpose of assuring that the new federal commission, with its "expansive powers," would not intrude on the existing regulatory authority of the state commissions over primarily intrastate telephone companies and services.[21] There is no evidence that Congress intended the jurisdiction reserved to the state commissions also to be "expansive." I therefore see no reason to ignore the literal language of Section 153(h) in order to give broader effect to Section 152(b) than its authors intended it to have.[22]IV. THE ADEQUACY OF THE COMMISSION'S FACTUAL CONCLUSIONS
 
 
 155
 In Midwest Video the Supreme Court noted that "(i)t was, of course, beyond the competence of the Court of Appeals itself to assess the relative risks and benefits of cablecasting." 406 U.S. at 674, 92 S.Ct. at 1874, 32 L.Ed.2d at 406. Based on its finding that the Commission had carefully considered the nature of the burden imposed on cable systems by the program origination requirement, the Court concluded that the Commission's action was supported by substantial evidence that the rule would serve the public interest. The appellate court's contrary holding was therefore reversed. See id. at 671-675, 92 S.Ct. 1860. Midwest Video, of course, involved a timely challenge to the program origination rule. The manner in which the Commission's preemptive regulations have been brought before us requires an even more deferential review of the basis for the Commission's actions. See Part II-A supra.
 
 
 156
 Judges Lumbard and Wilkey appear to reject three of the Commission's factual conclusions. They conclude that there is no basis for the Commission's beliefs that (1) dual regulation of leased access channels would be confusing or burdensome, Lumbard op. at ---- of --- U.S.App.D.C., at 622 of 533 F.2d, Wilkey op. at ---- of --- U.S.App.D.C., at 614 of 533 F.2d; (2) state and local rate regulation would impede the growth of cable services, Lumbard op. at ---- of --- U.S.App.D.C., at 622-623 of 533 F.2d; and (3) two-way nonvideo communications services will provide financial support for other cable activities, Lumbard op. at ---- of --- U.S.App.D.C., at 622-623 of 533 F.2d, Wilkey op. at ---- of --- U.S.App.D.C., at 614 of 533 F.2d. I find my colleagues' attacks on each of these conclusions unconvincing.
 
 
 157
 Both of my colleagues argue that the Commission's fear of detrimental impacts arising from confusion or additional paperwork attendant on dual regulation of leased access channels is belied by the well-established division of regulatory authority over telephone companies and other common carriers. This argument neglects the fact that cable, unlike the telephone companies, is an infant industry struggling to make itself into a major element of the nation's communications system. Moreover, this court has no basis for concluding that the technology and practices of the cable industry allow as clear a division between inter- and intrastate activities as is possible in other industries regulated by both the Commission and local regulatory bodies. Finally, I note that the Commission has recently reviewed the problems attendant to "duplicative and excessive over-regulation of cable television." Report and Order Terminating Proceeding, Docket No. 20272, 40 Fed.Reg. 34608 (1975). Its finding in that proceeding is consistent with its position here:
 
 
 158
 11. The comments submitted along with the experiences we have gained over the past three years convince us that the overall expenses being incurred by cable operators and subsequently the public far exceed the benefits derived from duplicative functions being performed on the federal and non-federal levels. * * *
 
 Id. at 34609.[23]
 
 159
 The burden of dual regulation itself refutes Judge Lumbard's suggestion that state and local regulation might be helpful rather than harmful and that the Commission had no basis for choosing one possibility over the other. This suggestion is also contradicted by the obvious interests of the parties to this proceeding. Thus, in its petition for reconsideration of the Clarification, GTE Service Corporation, "on behalf of itself and the GTE Telephone Operating Companies," JA 40, stated that "(t)he telephone carriers are obviously concerned that there be parity of regulation of their potential competitors." JA 42. Counsel for intervenor United States Independent Telephone Association made similar statements during oral argument before this court.[24] These statements obviously reflect the telephone companies' belief that the Commission's preemptive action will benefit the cable companies, and that imposition of state and local regulation would work to the benefit of cable's competitors. Moreover, the Commission's conclusion that public utility and rate regulation of cable services is premature and would be harmful is supported by both the FSLAC Report, supra, at 8, and the report of the Cabinet Committee on Cable Communications, supra, at 40, 42-43.
 
 
 160
 Finally, we have no basis for concluding that the Commission could not rationally find that nonvideo services will provide funds to support the growth of cable systems into a nationwide communications network. Manhattan Cable Television, Inc. intervened in this case for the express purpose of urging on us the importance of these services to its survival:
 
 
 161
 MCTV is steadily expanding its origination services including not only video originations such as pay cable but also non-video originations. For example, MCTV leases a channel to Reuters for the one-way transmission of digital signals carrying information primarily concerning the commodities markets for receipt only by certain specialized subscribers possessing equipment capable of decoding the transmissions. MCTV also leases portions of a cable television channel to a New York City bank with a number of branches and offices for the two-way transmission of data information at high speeds between computers and computer terminal equipment located throughout the city.
 
 
 162
 These non-video transmissions supply an important public service, are desired by an increasing percentage of MCTV's subscribers and promise to contribute significantly to the lessening of MCTV's revenue-cost imbalance.
 
 
 163
 Brief for intervenor MCTV at 3-4. Moreover, the fact that the Commission felt it necessary to require new cable systems to be built with minimum channel capacities and technical two-way capabilities sufficient to provide the type of services involved in this case does not demonstrate that those services will not be profitable. The Commission explained that its reason for imposing these requirements was to avoid the added costs resulting from changing already constructed systems. See Report and Order, supra, 36 FCC 2d at 190, 192. This effort to ensure that the planning horizon of cable enterpreneurs will not be shorter than is socially desirable carries no implication that the required services will be unprofitable over an appropriate time span.
 
 V. CONCLUSION
 
 164
 In the absence of congressional action to reformulate the Communications Act to reflect the technological developments of the last 40 years, the Federal Communications Commission has properly undertaken the task of protecting the national interest in new forms of electronic communications. Recognizing that Congress intended the Commission to assume such a protean role, the courts have refused to treat the jurisdictional sections of the Act as a procrustean limitation on the Commission's ability to serve the public interest. Today's decision, by insisting on an overly narrow interpretation of prior case law and by failing to recognize the appropriateness of unusually restricted review, in my judgment, is an unfortunate aberration.
 
 
 
 *
 Sitting by designation pursuant to 28 U.S.C. § 294(d) (1970)
 
 
 [1]
 This policy was first announced in the Cable Television Report and Order, Docket No. 18397, et al., 36 F.C.C.2d 143, 193, reconsidered in part, 36 F.C.C.2d 326 (1972). It was further elaborated upon in the Clarification of the Cable Television Rules, Docket No. 20018, et al., 46 F.C.C.2d 175, 185-86 (1974) and the Memorandum Opinion and Order, Docket No. 20018, et al., 49 F.C.C.2d 1078, 1081 (1974)
 Communications of the type at issue here are characterized by their utilization of cable lines for transmissions traveling in the opposite direction from cable television signals. Such return signals are generated at what is conventionally the receiving end for video cable transmissions, and thus convert the network into a two-way system. By virtue of the system's layout, the return transmissions run, at least initially, to the cable network's transmission center, and thus those transmissions may be described as point-to-point. (The possibility of point-to-multi-point transmissions exists, either by relay of the signals by the central CATV transmission station, or by creation of networks with more complex cable interconnections. It seems unlikely that such a development would significantly affect the legal issues before us.) We limit our consideration to non-video return transmissions primarily because video utilization of the return mode does not appear to be economically and/or technologically feasible at this time. Some possible uses for the return, non-video use of a cable television system are set out in the 1972 Order, quoted in note 44, infra.
 
 
 [2]
 The Commission asserted jurisdiction over all cable television systems in the Second Report and Order, Docket No. 15971, et al., 2 F.C.C.2d 725 (1966). It had previously rejected a request that it do so. Frontier Broadcasting Co. v. Collier, 24 F.C.C. 251 (1958)
 
 
 [3]
 Cablecasting is the transmission of programming other than that which is originated by broadcast stations. 47 C.F.R. § 76.5(v) (1974)
 
 
 [4]
 36 F.C.C.2d at 190-93
 
 
 [5]
 47 C.F.R. § 76.251(a)(3)-(7) (1974)
 
 
 [6]
 The "major television markets" are set forth in 47 C.F.R. § 76.51 (1974)
 
 
 [7]
 47 C.F.R. § 75.251(a)(9) (1974)
 
 
 [8]
 47 C.F.R. § 76.251(a)(8) (1974)
 
 
 [9]
 47 C.F.R. § 76.251(a)(10) (1974)
 
 
 [10]
 47 C.F.R. § 76.251(a)(7) (1974)
 
 
 [11]
 47 C.F.R. § 76.251(a)(3) (1974). The regulations require only a "technical" rather than an operational two-way capability. This appears to mean that the cable transmission plant must have a receiving capability, but not that customer receivers be able to transmit. 36 F.C.C.2d at 192-93; 46 F.C.C.2d at 183
 
 
 [12]
 47 C.F.R. § 76.251(a)(11)(iii) (1974)
 
 
 [13]
 47 C.F.R. § 76.251(a)(7) (1974)
 
 
 [14]
 47 C.F.R. § 76.251(a)(11)(iv) (1974); 36 F.C.C.2d at 193. Of course the government channel is substantially under the control of the local governments which utilize it
 
 
 [15]
 The Clarification, 46 F.C.C.2d at 185-86, generally reaffirmed the pre-emption policy as applied in general to communications over the leased access channels. At that time there was no discussion of the peculiar pre-emption problems raised by use of the leased access bandwidth for two-way communications for hire. These issues were first addressed in the Memorandum Opinion and Order, 49 F.C.C.2d at 1080-84 (1974), where the Commission discussed in some depth the questions now before the Court
 A failure to recognize that the FCC had never even mentioned the two-way, point-to-point services now at issue here before 1974 may be responsible for Judge Wright's reliance on an extensive quotation from the 1972 Report and Order (pp. 4-5). The language of the Commission, referring to "access programming" and "turn the dial," shows that the FCC is talking about educational, governmental, public and leased channels carrying programming. None of these uses, all video transmissions, is at issue here. The two-way, point-to-point services were not mentioned and their nature makes it impossible to infer that the FCC language was dealing with them by implication.
 
 
 [16]
 49 F.C.C.2d at 1084, quoting 47 U.S.C. § 151 (1970)
 
 
 [17]
 49 F.C.C.2d at 1083-84
 
 
 [18]
 47 U.S.C. § 152 Application of chapter:
 (a) The provisions of this chapter shall apply to all interstate and foreign communication by wire or radio and all interstate and foreign transmission of energy by radio, which originates and/or is received within the United States, and to all persons engaged within the United States in such communication or such transmission of energy by radio, and to the licensing and regulating of all radio stations as hereinafter provided; but it shall not apply to persons engaged in wire or radio communication or transmission in the Canal Zone, or to wire or radio communication or transmission wholly within the Canal Zone.
 
 
 [19]
 392 U.S. 157, 178, 88 S.Ct. 1994, 20 L.Ed.2d 1001 (1968)
 
 
 [20]
 406 U.S. 649, 662-63, 92 S.Ct. 1860, 32 L.Ed.2d 390 (1972)
 
 
 [21]
 47 U.S.C. § 301-99 (1970)
 
 
 [22]
 392 U.S. at 169 n. 29, 88 S.Ct. 1994
 
 
 [23]
 Section 221(b) of Title 47 is a provision similar to § 152(b), which denies FCC jurisdiction over "telephone exchange service" in any case where such activities are subject to state or local regulation, except as otherwise provided by § 301. "Telephone exchange" connotes a highly developed, interconnected system operated to provide "service of the character ordinarily furnished by a single (telephone) exchange," 47 U.S.C. § 153(r) (1970). We can not conclude at this time that the two-way, non-video communications via cable will become part of a network of such complexity as to be appropriately assimilable with telephone exchanges. In view of our conclusion as to the applicability of § 152(b), we find it unnecessary to consider whether the § 221(b) exclusion of FCC jurisdiction can possibly become applicable should two-way, non-video use of cable facilities achieve a substantial potential for intercommunication
 We are aware of this court's own opinion in General Telephone Co. v. FCC, 134 U.S.App.D.C. 116, 127-28 n. 19, 413 F.2d 390, 401-02 n. 19, cert. denied, 396 U.S. 888, 90 S.Ct. 173, 24 L.Ed.2d 163 (1969), which held without extended discussion that cable TV, operating in its conventional one-way mode, did not constitute a telephone exchange service. Because that case did not present any question of two-way communications of the sort presently before the court, it is inapposite to these facts and does not foreclose the possibility that cable operators may at some future time offer services which make applicable the § 221(b) jurisdictional bar.
 
 
 [24]
 Frequently referred to as § 2(b) of the Communications Act of 1934
 
 
 [25]
 47 U.S.C. § 152. Application of chapter
 (b) Subject to the provisions of section 301 of this title, nothing in this chapter shall be construed to apply or to give the Commission jurisdiction with respect to (1) charges, classifications, practices, services, facilities, or regulations for or in connection with intrastate communication service by wire or radio of any carrier, or (2) any carrier engaged in interstate or foreign communication solely through physical connection with the facilities of another carrier not directly or indirectly controlling or controlled by, or under direct or indirect common control with such carrier, or (3) any carrier engaged in interstate or foreign communication solely through connection by radio, or by wire and radio, with facilities, located in an adjoining State or in Canada or Mexico (where they adjoin the State in which the carrier is doing business), of another carrier not directly or indirectly controlling or controlled by, or under direct or indirect common control with such carrier, or (4) any carrier to which clause (2) or clause (3) of this subsection would be applicable except for furnishing interstate mobile radio communication service or radio communication service to mobile stations on land vehicles in Canada or Mexico; except that sections 201-205 of this title shall, except as otherwise provided therein, apply to carriers described in clauses (2)-(4) of this subsection.
 The statute uses the term "carrier" which, under 47 U.S.C. § 153(h) (1970), is the equivalent of "common carrier."
 
 
 [26]
 49 F.C.C.2d at 1082
 It has been held several times that cable systems, operating in the characteristic broadcast retransmission mode, are not common carriers. United States v. Southwestern Cable Co., 392 U.S. 157, 169 n.29, 88 S.Ct. 1994, 20 L.Ed.2d 1001 (1968); Philadelphia Television Broadcasting v. FCC, 123 U.S.App.D.C. 298, 300, 359 F.2d 282, 284 (1966); Frontier Broadcasting Co. v. Collier, 24 F.C.C. 251, 254 (1958).
 
 
 [27]
 Washington ex rel. Stimson Lumber Co. v. Kuykendall, 275 U.S. 207, 211-12, 48 S.Ct. 41, 42, 72 L.Ed. 241, 245 (1927); United States v. California, 297 U.S. 175, 181, 56 S.Ct. 421, 80 L.Ed. 567 (1936)
 The Commission has, itself, in another context, argued successfully that it is the character of the communication rather than the character of the facilities which determines the scope of the exclusion under § 152(b), General Telephone Co. v. FCC, 134 U.S.App.D.C. 116, 127-28 n.19, 413 F.2d 390, 401-02 n.19, cert. denied, 396 U.S. 888, 90 S.Ct. 173, 24 L.Ed.2d 163 (1969).
 
 
 [28]
 In support of its decision to treat cable as an "organic whole," to be left entirely free from common carrier regulation, the Commission advances the argument that such treatment is necessary for the fulfillment of its other duties under the Act. These arguments will be discussed in the next section, considering whether the controverted pre-emption is justified under the statute read as a whole. The conclusion set out in text above only indicates that the Commission's statutory construction does not readily jump to mind from the plain words of § 152(b)
 
 
 [29]
 National Ass'n of Reg. Util. Comm'rs v. FCC, --- U.S.App.D.C. ---, ---, 525 F.2d 640, 642 (5 Jan. 1976)
 
 
 [30]
 Under 47 U.S.C. § 153(h) (1970), a common carrier is defined as "any person engaged as a common carrier for hire. . . ."
 
 
 [31]
 Under 47 C.F.R. § 21.1 (1974), a communication common carrier is defined as "(a)ny person engaged in rendering communication service for hire to the public."
 
 
 [32]
 Semon v. Royal Indemnity Co., 279 F.2d 737, 739 (5th Cir. 1960), and cases cited 174 U.S.App.D.C. ---, ---, 525 F.2d 630, 641 n.58 (5 Jan. 1976)
 
 
 [33]
 Washington ex rel. Stimson Lumber Co. v. Kuykendall, 275 U.S. 207, 211-12, 48 S.Ct. 41, 72 L.Ed. 241 (1927)
 
 
 [34]
 Semon v. Royal Indemnity Co., 279 F.2d 737, 739-40 (5th Cir. 1960)
 
 
 [35]
 --- U.S.App.D.C. at ---, 525 F.2d at 641, n.58 (5 Jan. 1976)
 
 
 [36]
 Industrial Radiolocation Service, 5 F.C.C.2d 197, 202 (1966); Frontier Broadcasting Co. v. FCC, 24 F.C.C. 251, 254 (1958) (Holding one-way cable television transmission to be a non-common carrier activity, because the content of transmissions is not under the control of the subscriber)
 
 
 [37]
 47 C.F.R. § 76.251(a)(11)(iii) (1974). In its 1974 Clarification, the Commission stated that "(a)ll parties must be given access to leased channels at rates not designed to prohibit entry." 46 F.C.C.2d at 186
 
 
 [38]
 47 C.F.R. § 76.251(a)(7) (1974)
 
 
 [39]
 36 F.C.C.2d at 356
 
 
 [40]
 46 F.C.C.2d at 186
 
 
 [41]
 --- U.S.App.D.C. ---, ---, 525 F.2d 640, 641 (5 Jan. 1976)
 
 
 [42]
 Id
 
 
 [43]
 47 C.F.R. § 76.251(a)(3) (1974)
 
 
 [44]
 The Commission has stated that a system limited to such a non-voice return capability "can be useful in a number of ways for survey, marketing services, burglar alarm devices, educational feedback, to name a few." 36 F.C.C.2d at 192
 
 
 [45]
 The most primitive uses of such return transmission technology would appear to involve the transmission of a single signal, to convey a pre-determined message. A burglar alarm system, conveying the message of illicit entry, seems to be one of the simplest uses for such technology
 
 
 [46]
 A burglar alarm, involving the purchase of a service whereby the customer intends and expects a message to be sent at the occurrence of a particular event, is an example of implicit customer control
 
 
 [47]
 The Commission appears to concede as much, both in its most recent report, 49 F.C.C.2d at 1082, and in its brief. Respondent's Brief at 14
 
 
 [48]
 See T. V. Pix, Inc. v. Taylor, 304 F.Supp. 459 (D.Nev.1968) (upholding state regulation of the intrastate incidents of a cable system having an interstate dimension as well)
 
 
 [49]
 The broader question of whether the general Title III power over broadcasting contains a penumbra of sufficient breadth to reach the activities in question, is dealt with in Section II, infra
 
 
 [50]
 Respondent's Brief at 16; 49 F.C.C.2d at 1082-83
 
 
 [51]
 The Supreme Court has twice affirmed specific Commission assertions of jurisdiction over cable TV. United States v. Midwest Video Corp., 406 U.S. 649, 92 S.Ct. 1860, 32 L.Ed.2d 390 (1972); United States v. Southwestern Cable Co., 392 U.S. 157, 88 S.Ct. 1994, 20 L.Ed.2d 1001 (1968)
 
 
 [52]
 49 F.C.C.2d at 1082; Respondent's Brief at 19
 
 
 [53]
 Respondent's Brief at 17
 
 
 [54]
 392 U.S. 157, 88 S.Ct. 1994 (1968) (Harlan, J.)
 
 
 [55]
 Id. at 160-61, 88 S.Ct. 1994
 
 
 [56]
 Id. at 161-66, 88 S.Ct. 1994
 
 
 [57]
 Id. at 175, 88 S.Ct. 1994
 
 
 [58]
 Id. at 174-75, 88 S.Ct. 1994
 
 
 [59]
 47 U.S.C. §§ 201-23 (1970)
 
 
 [60]
 47 U.S.C. §§ 301-99 (1970)
 
 
 [61]
 See note 18 supra
 
 
 [62]
 392 U.S. at 178, 88 S.Ct. at 2005, 20 L.Ed.2d at 1016. The Court noted that it was expressing "no views as to the Commission's authority, if any, to regulate CATV under any other circumstances or for any other purpose." Id
 
 
 [63]
 406 U.S. 649, 92 S.Ct. 1860, 32 L.Ed.2d 390 (1972) (Brennan, J.)
 
 
 [64]
 Id. at 669, 92 S.Ct. at 1871, 32 L.Ed.2d at 403
 
 
 [65]
 Id. at 667, 92 S.Ct. at 1870, 32 L.Ed.2d at 402
 
 
 [66]
 Id. at 675, 92 S.Ct. at 1874, 32 L.Ed.2d at 407
 
 
 [67]
 Id. at 676, 92 S.Ct. at 1874, 32 L.Ed.2d at 407
 
 
 [68]
 The section states only that the provisions of the "chapter" (which includes the entire 1934 Act) "shall apply" to all interstate and foreign communication by wire or radio. See note 18 supra. It differs in this respect from some other sections of the Act which, in conferring powers on the Commission, state in terms what the Commission is obligated and empowered to do. See, e. g., 47 U.S.C. § 303 (1970)
 
 
 [69]
 392 U.S. at 178, 88 S.Ct. at 2006, 20 L.Ed.2d at 1016
 This refutes the attempt of Judge Wright (p. ---- of --- U.S.App.D.C., p. 610 of 533 F.2d) to construe the Court's language re section 152(a), 392 U.S. at 172, 88 S.Ct. 1994, as validating FCC jurisdiction even if the cable transmission was unrelated to broadcasting. The Court emphasized ". . . respondents thus are ordinarily employed in the simultaneous retransmission of (broadcast) communications that have very often originated in other States. The stream of communication is essentially uninterrupted and properly indivisible." Id. at 169, 88 S.Ct. at 2001, 20 L.Ed.2d at 1011. Southwestern thus dealt with cable activity unquestionably inter state and definitely partaking of the nature of broadcasting. Neither is true of the two-way, point-to-point services involved here.
 
 
 [70]
 406 U.S. at 662-63, 92 S.Ct. 1860
 
 
 [71]
 Id. at 662-70, 92 S.Ct. 1860. Establishment of such a particular connection would be superfluous if the Court were asserting a general jurisdiction over all cable operations. While there is some language in the opinion which might be read to suggest such a "comprehensive" jurisdiction, id. at 662-63, 92 S.Ct. 1860 n.21, we believe that the substantial effort made to bring the origination requirement itself within the ancillariness standard belies any such intention by the plurality
 
 
 [72]
 Id. at 676, 92 S.Ct. 1860
 
 
 [73]
 49 F.C.C.2d at 1083
 
 
 [74]
 Fortnightly Corp. v. United Artists Television, Inc., 392 U.S. 390, 398-99, 88 S.Ct. 2084, 20 L.Ed.2d 1176 (1968) (whereas broadcasters are "exhibitors" and thus subject to liability under the copyright laws, cable operators retransmitting broadcast signals are to be treated as non-liable "viewers")
 We recognize that the Supreme Court's plurality opinion in Midwest states that Fortnightly "has no bearing on the 'reasonably ancillary' question." 406 U.S. at 663-64, 92 S.Ct. at 1868, 32 L.Ed.2d at 400, n.22. The test of ancillariness looks to the connection between the particular regulation and the broadcast purposes, and thus the dichotomy drawn under the copyright laws is not relevant to it. We believe, however, that Fortnightly is relevant to the broader question of whether the FCC has blanket jurisdiction over all activities of cable operators. Any recognition of such across-the-board power would not rest upon the nature of particular regulations, but would be a generalized assimilation of cable to broadcasting for all purposes. Fortnightly's refusal to make this assimilation in the area of copyright law is therefore not insignificant.
 
 
 [75]
 Teleprompter Corp. v. CBS, 415 U.S. 394, 404-05, 94 S.Ct. 1129, 39 L.Ed.2d 415 (1974) (Holding of Fortnightly affirmed, even where cable operator engaged in some origination cablecasting, thus enhancing parallel between cable and broadcast operations)
 
 
 [76]
 49 F.C.C.2d at 1083
 
 
 [77]
 This longterm goal which the Commission sets out for itself apparently has its roots in the general purpose section of the Act, 47 U.S.C. § 151 (1970). While that section does set forth worthy aims toward which the Commission should strive, it has not heretofore been read as a general grant of power to take any action necessary and proper to those ends. Especially in view of our conclusion that § 152(b) seems to bar Commission jurisdiction in this case, see Section I supra, we are extremely dubious about the legal substance of this argument by the Commission, even if the facts were available to support it
 
 
 [78]
 In its brief, Respondent states that acceptance of petitioner's position "would lead to the absurd and illogical conclusion that the Commission has the authority to require the capacity for access cablecasting, including non-voice return communication, but is without authority to regulate the activity." Respondent's Brief at 19
 
 
 [79]
 Respondent's Brief at 18; 49 F.C.C.2d at 1083
 
 
 [80]
 In reference to the significant local role provided under the Commission's regulations, see 47 C.F.R. § 76.31 (1974). The Commission has stated its intention to create "a cohesive, cooperative program between federal and local authorities." 46 F.C.C.2d at 188. See also National Cable Television Ass'n v. United States, 415 U.S. 336, 339, 94 S.Ct. 1129, 39 L.Ed.2d 415 (1974); 46 F.C.C.2d at 188-208
 
 
 [81]
 Respondent's Brief at 18; 49 F.C.C.2d at 1083. The argument is implicit rather than explicit because of the way it is phrased. In the Order, reference is made generally to the financial benefits of "additional services including leased access," rather than to any profits expected from the particular two-way communications at issue here. The brief quotes from the initial 1972 Report, to the effect that "non-broadcast" activities (including cablecasting) "can be profitable to the cable owner." Nowhere do we find a specific assertion as to the profitability of the two-way utilization of cable. See also Brief of Intervenor Manhattan Cable TV at 3-4
 
 
 [82]
 46 F.C.C.2d at 183
 
 
 [83]
 47 C.F.R. § 76.251(a)(3) (1974)
 
 
 [84]
 See Office of Telecommunications Policy, The Domestic Telecommunications Industry: Economic Behavior, Competition, and Public Policy, at 341-65, especially 347 (NTIS No. PB-238 020 1974) (raising serious doubts that existing cable systems can ever be competitive with telephone lines in provision of data transmission services)
 
 
 [85]
 392 U.S. at 174-75, 88 S.Ct. 1994
 
 
 [86]
 406 U.S. at 662-70, 92 S.Ct. 1860
 
 
 [87]
 Id. at 664-65, 92 S.Ct. 1860
 
 
 [88]
 See id. at 668-69, 92 S.Ct. 1860, quoting NBC v. United States, 319 U.S. 190, 203, 218, 63 S.Ct. 997, 87 L.Ed. 1344 (1943)
 
 
 [89]
 Id. at 669, 92 S.Ct. 1860
 
 
 [90]
 Under 47 U.S.C. § 221(b)(1970). state and local regulatory bodies are given the power to pre-empt Commission jurisdiction over even interstate telephone exchange services, by exercising a regulatory power of their own
 
 
 [91]
 Respondent's Brief at 20-24
 
 
 [92]
 NBC v. United States, 319 U.S. 190, 219, 63 S.Ct. 997, 87 L.Ed. 1344 (1943)
 
 
 [93]
 United States v. Midwest Video Corp., 406 U.S. 649, 675-76, 92 S.Ct. 1860, 32 L.Ed.2d 390 (1972) (Burger, C. J., concurring); Red Lion Broadcasting Co. v. FCC, 395 U.S. 367, 380, 89 S.Ct. 1794, 23 L.Ed.2d 371 (1969); United States v. Storer Broadcasting Co., 351 U.S. 192, 203, 76 S.Ct. 763, 100 L.Ed. 1081 (1956); NBC v. United States, 319 U.S. 190, 219, 63 S.Ct. 997, 87 L.Ed. 1344 (1943); FCC v. Pottsville Broadcasting Co., 309 U.S. 134, 138, 60 S.Ct. 437, 84 L.Ed. 656 (1940); Federal Radio Comm. v. Nelson Bros. Bond & Mortgage Co., 289 U.S. 266, 285, 53 S.Ct. 627, 77 L.Ed. 1166 (1933)
 
 
 [94]
 This is the phrase used by Chief Justice Burger in his decisive concurrence upholding the Commission action in Midwest. 406 U.S. at 676, 92 S.Ct. 1860
 
 
 [95]
 47 U.S.C. § 303 (1970)
 
 
 [96]
 FCC v. RCA Communications, Inc., 346 U.S. 86, 90-91, 73 S.Ct. 998, 97 L.Ed. 1470 (1953); Hawaiian Tel. Co. v. FCC, 162 U.S.App.D.C. 229, 234-35, 498 F.2d 771, 776-77 (1974)
 
 
 [97]
 Illinois Citizens Comm. v. FCC, 467 F.2d 1397, 1400 (7th Cir. 1972); Kitchen v. FCC, 150 U.S.App.D.C. 292, 294, 464 F.2d 801, 803 (1972); Sterling Manhattan Cable Television, Inc. v. New York Tel. Co., 38 F.C.C.2d 1149 (1973)
 
 
 [98]
 The fast moving nature of communications technology, and the loose language of the statute, provide some basis for believing that Congress intended to allow the FCC a wider latitude than it typically granted to other agencies
 
 
 [99]
 Respondent's Brief at 20
 
 
 [100]
 Red Lion Broadcasting Co. v. FCC, 395 U.S. 367, 381, 89 S.Ct. 1794, 23 L.Ed.2d 371 (1969); National Ass'n of Theatre Owners v. FCC, 136 U.S.App.D.C. 352, 358, 420 F.2d 194, 200 (1969); General Tel. Co. v. FCC, 134 U.S.App.D.C. 116, 127, 413 F.2d 390, 401 (1969); Philadelphia Television Broadcasting Co. v. FCC, 123 U.S.App.D.C. 298, 299-300, 359 F.2d 282, 283-84 (1966)
 
 
 [101]
 National Ass'n of Regulatory Util. Comm'rs v. FCC, --- U.S.App.D.C. ----, ----, 525 F.2d 630, 644 (5 Jan. 1976). But see Philadelphia Television Broadcasting Co. v. FCC, 123 U.S.App.D.C. 298, 300, 359 F.2d 282, 284 (1966)
 
 
 [102]
 National Ass'n of Regulatory Util. Comm'rs v. FCC, --- U.S.App.D.C. ----, ----, 525 F.2d 640, 642 (5 Jan. 1976)
 
 
 [103]
 Respondent's Brief at 21-24; 46 F.C.C.2d at 184-185; 36 F.C.C.2d at 194
 
 
 [104]
 United Telegraph Workers v. FCC, 141 U.S.App.D.C. 190, 193-94, 436 F.2d 920, 923-24 (1970); Connecticut Committee Against Pay TV v. FCC, 112 U.S.App.D.C. 248, 250, 301 F.2d 835, 837, cert. denied, 371 U.S. 816, 83 S.Ct. 28, 9 L.Ed.2d 57 (1962)
 
 
 [105]
 Section 218 of Title 47 U.S.C. states that the Commission "shall keep itself informed as to . . . technical developments and improvements in wire and radio communication and radio transmission of energy to the end that the benefits of new inventions and developments may be made available to the people of the United States."
 
 
 [106]
 Section 303(g) of Title 47, U.S.C., commands the Commission to "(s)tudy new uses for radio, provide for experimental uses of frequencies, and generally encourage the larger and more effective use of radio in the public interest."
 
 
 [107]
 523 F.2d 1344 (9th Cir. 1975)
 
 
 [108]
 Id. at 1350-51
 
 
 [109]
 The Ninth Circuit opinion does not specifically address the pre-emption aspect of the Commission's regulations. It only goes so far as to note the Commission's general strategy of allowing "the forces of the market place to function freely." Id. at 1349. See note 113 infra
 
 
 [110]
 Id. at 1350
 
 
 [111]
 Id. at 1349
 
 
 [112]
 The Ninth Circuit does state its holding as a validation both of the refusal to impose Title II regulation, and of existing regulations as formulated by the Commission. Id. at 1351. This might lead one to conclude that they had in mind the part of the regulations which pre-empts state and local authorities. 47 C.F.R. §§ 76.251(a)(11)(iv) (1974). However, the opinion states its affirmance only of "the rules above described," 523 F.2d at 1351, and the description of the rules at the outset of the discussion of the merits, id. at 1348-49, contains no reference to that section. This, coupled with the court's failure to discuss pre-emption at any time, leads us to conclude that there was no intention that the holding extend to that issue
 
 
 [113]
 There are two reasons why this is so. First, there may be arguments for allowing the Commission to decline to exercise its statutory powers, which do not apply to its attempt to pre-empt state regulation. For example, it may be contended and has elsewhere been held, Philadelphia Television Broadcasting Co. v. FCC, 123 U.S.App.D.C. 298, 300, 359 F.2d 282, 284 (1966), that a part of the broad discretion allowed the Commission under the Act involves the power not to exercise particular authority which it has been granted
 Second, there clearly are strong arguments for denying the pre-emption power, which do not militate against the refusal to exercise Title II powers. Whereas all of the activities within the Title II controversy before the Ninth Circuit were unquestionably within the jurisdiction of the Commission, there is substantial reason to believe that the activities over which pre-emption is asserted here are not. There is thus the vital difference between a refusal to use granted power, and an attempt to prevent regulation by others in an area where no ordinary Commission jurisdiction appears to exist.
 
 
 [1]
 Manhattan Cable Television, Inc. and National Cable Television Association, Inc. have intervened in support of the F.C.C. The United States Independent Telephone Association has intervened in support of NARUC
 
 
 [1]
 This history of the Commission's approach to regulation of cable is recounted in United States v. Southwestern Cable Co., 392 U.S. 157, 164-167, 88 S.Ct. 1994, 20 L.Ed.2d 1001 (1968). See also, e. g., Kahn, Cable, Competition, and the Commission, 24 Catholic U.L.Rev. 854 (1975)
 
 
 [2]
 The notices are listed in Cable Television Report and Order, 36 FCC 2d 143, 143-144 (1972)
 
 
 [3]
 As originally promulgated, the access and minimum capacity regulations applied immediately to all cable systems which commenced operation in one of the top 100 television markets on or after March 31, 1972. All other systems in those markets had until March 31, 1977 to comply. 36 FCC 2d at 242. The regulations have been amended so that systems in operation prior to March 31, 1972 are no longer required to bring themselves into full compliance with the rules by any set date. See 47 C.F.R. § 76.251(c) (1975)
 
 
 [4]
 The Commission has solicited information upon which to base a determination whether the two-way capacity requirement should be modified. See Notice of Proposed Rulemaking, Docket No. 20508, 40 Fed.Reg. 27250, 27255, P & F Radio Reg. Current Serv. 85:155, 85:168-169 (1975)
 
 
 [5]
 Nothing in the Commission's language suggests that the preemptive regulation applies only to some of the services provided over leased channels. The implication that the preemption of regulations regarding two-way, non-video services was not addressed until 1974, see Wilkey op. --- U.S.App. ---, 533 F.2d 606, is, therefore, unfounded. Petitioners abandoned that argument on appeal. See p. --- U.S.App.D.C. ---, 533 F.2d 632-633 infra
 
 
 [6]
 Clarification of the Cable Television Rules and Notice of Proposed Rulemaking and Inquiry, 46 FCC 2d 175, 177, JA 1, 4 (1974)
 
 
 [7]
 Federal Communications Commission, The Final Report of the FCC Cable Television Advisory Committee on Federal State-Local Regulatory Relationships (undated, mimeographed)
 
 
 [8]
 GTE Service Corporation filed a "Petition for Clarification and/or Modification" of the Clarification. JA 40. GTE is not a party to this appeal. Petitioner National Association of Regulatory Utility Commissioners filed a "Statement in Support of Petitions for Reconsideration, Clarification and/or Modification" (hereinafter NARUC Statement), JA 46
 
 
 [9]
 See NARUC Statement, supra note 8, JA 47-50
 
 
 [10]
 Id., JA 51
 
 
 [11]
 We should also recognize that the Commission is continuing to review its policies and to question the assumptions on which it has proceeded. See, e.g., Report and Order Terminating Proceeding, Docket No. 20272, 40 Fed.Reg. 34608, 34 P & F Radio Reg.2d 1229 (1975) (inquiry concerning duplicative and excessive regulation of cable television); Notice of Proposed Rulemaking, supra note 4; Report and Order, 49 FCC 2d 1090 (1974), reconsidered in part, 40 Fed.Reg. 28804, 34 P & F Radio Reg.2d 631 (1975) (eliminating cablecast program origination requirement)
 
 
 [12]
 47 U.S.C. § 405 (1970) precludes judicial review of "questions of fact or law upon which the Commission * * * has been afforded no opportunity to pass." Since the petitions for reconsideration, see note 8 supra, did not challenge the factual conclusions my colleagues find untenable, see Part IV, infra, we are without jurisdiction to review the Commission's findings of fact. See, e.g., Gross v. FCC, 480 F.2d 1288, 1290-1291 n.5 (2d Cir. 1973)
 
 
 [13]
 There can be no question that the Commission's description of its regulatory program as tentative and experimental is bona fide. See note 11 supra
 Judge Lumbard would not allow the Commission to experiment "in the absence of a showing that the results of the experiment would be ancillary to broadcasting." Lumbard op. at ---- of --- U.S.App.D.C., at 622 of 533 F.2d. If this statement requires more than a finding that the Commission could rationally conclude that positive results would support broadcasting, I think it places too great a burden on the Commission at this stage. The statement also errs by ignoring the possibility of jurisdiction ancillary to § 1 of the Communications Act, 47 U.S.C. § 151. See p.---- of --- U.S.App.D.C., p. 632-633 of 533 F.2d, infra.
 
 
 [14]
 The extent of interstate nonvideo two-way programming, the interdependence between inter- and intrastate nonvideo programming, and the resulting need to maintain a unified system of regulation may be less clear than were the analogous factors in Southwestern Cable. I see no meaningful distinction, however, between our case and the primarily local cablecasts at issue in Midwest Video. In any case, considering the difficulty of predicting the course of development of the services at issue here and the experimental nature of the Commission's approach, it is inappropriate for us to conclude now that the Commission is without authority to act. Cf. National Ass'n of Theatre Owners v. FCC, 136 U.S.App.D.C. 352, 357, 420 F.2d 194, 199 (1969), cert. denied, 397 U.S. 922, 90 S.Ct. 914, 25 L.Ed.2d 102 (1970)
 
 
 [15]
 Judge Lumbard apparently agrees with this conclusion insofar as the "reasonably ancillary" criterion, discussed in text infra, is satisfied. See Lumbard op. at ---- of --- U.S.App.D.C., at 621 of 533 F.2d. Our only disagreement is over the meaning of that criterion
 
 
 [16]
 These services are clearly covered by the majority opinions, which rely on Judge Wilkey's definition of two-way nonvideo communications as "(c) ommunications * * * characterized by their utilization of cable lines for transmissions traveling in the opposite direction from cable television signals." Wilkey op. at n.1
 As I indicate in text infra, there is a basis for concluding that intrastate nonvideo two-way services not so closely related to transmission of video signals are also within the Commission's jurisdiction. Even if that argument is rejected, however, our proper course, considering the experimental nature of the Commission's regulations, is to affirm. If services which are not within the ancillary to broadcasting rationale of the text develop and if experience with their operation demonstrates that it is administratively feasible to divide regulation among at least two administrative agencies, the Commission can be required to take appropriate action. Petitioners have not shown that such action is necessary now. Cf. United Telegraph Workers v. FCC, 141 U.S.App.D.C. 190, 192-194, 436 F.2d 920, 922-924 (1970).
 
 
 [17]
 The portion of the Memorandum Opinion referred to is quoted in text at p. ---- of --- U.S.App.D.C., 626 of 533 F.2d supra. I read the passage as referring to the need for cable systems to expand the range of their service offerings if cable is to fulfill its potential role in the national communications system
 
 
 [18]
 Judge Wilkey also maintains that since similar services may be offered by companies subject to local utility regulation, the Commission's preemptive "order (is) objectionable as unfair to the regulated entities * * * ." Wilkey op. at ---- of --- U.S.App.D.C., at 616 of 533 F.2d. See also Lumbard op. at ---- of --- U.S.App.D.C., at 622 of 533 F.2d. This argument "relies on a distorted notion of equity, which would justify pervasive and detailed regulation of cable simply for the benefit of cable's competitors." Cabinet Committee on Cable Communications, Report to the President 40 (1974)
 
 
 [19]
 Judge Wilkey apparently agrees that determination of jurisdiction under § 152(a) is essentially dispositive of the issues arising under § 152(b). See Wilkey op. at ---- of --- U.S.App.D.C., at 616-617 of 533 F.2d
 
 
 [20]
 Since § 152(b)(1) does not refer to "common carriers not subject to this chapter," the exception contained in the statutory definition is not relevant here. Compare 47 U.S.C. §§ 201(b), 211 (1970)
 
 
 [21]
 See H.R.Rep. No. 1850, 73d Cong., 2d Sess., 4 (1934); S.Rep. No. 781, 73d Cong., 2d Sess., 3 (1934). The floor debates made this purpose explicit. See 78 Cong.Rec. 8823 (1934); id. at 8846-8847; id. at 10313
 
 
 [22]
 Other courts have interpreted the jurisdictional limitations of § 152(b) narrowly in view of that section's limited purpose. See United States v. Southwestern Cable Co., supra note 1, 392 U.S. at 169 n.29, 88 S.Ct. 1994; General Telephone Co. v. FCC, 134 U.S.App.D.C. 116, 127-128 n.19, 413 F.2d 390, 401-402 n.19, cert. denied, 396 U.S. 888, 90 S.Ct. 173, 24 L.Ed.2d 163 (1969); General Telephone Co. v. United States, 449 F.2d 846, 855 (5th Cir. 1971). Although these cases construe § 152(b)(2), their understanding of the limited purpose of the provision applies to § 152(b)(1) as well. Section 152(b)(2) was added by Senator Clark's amendment, which was accepted by the Act's floor manager "because its purpose is to accomplish that which we have tried to do throughout the bill; that is, to protect the independent (telephone) companies." 78 Cong.Rec. 8847 (remarks of Senator Dill)
 
 
 [23]
 See also Cabinet Committee on Cable Communications, supra note 18, at 41; FSLAC Report, supra note 7, at 31-42
 Since the issue before us is the Commission's power to preempt nonfederal rate regulation, it is irrelevant that the Commission has chosen not to regulate rates itself. Given the Commission's concern that local regulation might be designed to protect existing providers of communications services or might otherwise harm the development of cable, allowing local regulation if the Commission does not regulate might force the Commission to regulate preemptively. It would be ludicrous to compel the Commission to follow a policy it rejects in order to preserve its power.
 Judge Wilkey argues that since "the Commission itself has recognized the role of local authorities in granting franchises and rights of way for the cables used(,)" it is illogical for the Commission to contend that the involvement of more than one administrative body would create difficulties. Wilkey op. at ---- of --- U.S.App.D.C., at 614 of 533 F.2d. I see no contradiction in the Commission's decision totally to preempt some areas of cable regulation while leaving to local authorities
 responsibility for the non-operational aspects of cable franchising including bonding agreements, maintenance of rights-of-way, franchisee selection and conditions of occupancy and construction (within broad federal guidelines as to the latter two points).
 Report and Order Terminating Proceeding, supra note 11, 40 Fed.Reg. at 34611, 34 P & F Radio Reg. at 1240.
 
 
 [24]
 See also note 18 supra