[PUBLISH]

**CORRECTED OPINION**

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

**FILED**

**U.S. COURT OF APPEALS**
**ELEVENTH CIRCUIT**
**09/23/99**
**THOMAS K. KAHN**
**CLERK**

—————————————

No. 97-2090

—————————————

D.C. Docket No. 94-82-CIV-T-21C


EAGLEVIEW TECHNOLOGIES, INC.,

Plaintiff-Counter-
Defendant Appellant,

DAVID R. ANDERSON,

Plaintiff-Counter-Defendant
Counter-Claimant,

    versus

MDS ASSOCIATES, a Florida general
partnership; JAMES DWYER, et al.,

Defendants-Counter-
Defendants Counter-
Claimants-Appellees,

MICHAEL L. PAOLINI, President of Eagleview,

Counter-Defendant,

PRESCIENT TELECOMMUNICATIONS,
INC., et al.,

                                    Defendants-Counter-Defendants.

_____

Appeal from the United States District Court for the
Middle District of Florida

_____

**(September 23, 1999
(As Amended October 13, 1999)**

Before ANDERSON, Chief Judge, RONEY, Senior Circuit Judge, and COOK[*],
Senior District Judge.

PER CURIAM:

Plaintiff Eagleview Technologies, Inc. appeals the district court's grant of judgment as a matter of law in favor of the defendants, MDS Associates, for Eagleview's claim that MDS violated the Communications Act of 1934 ("the Act"), 47 U.S.C. § 207, by refusing its request for common carrier service and discriminating against it. Eagleview asserts that district court based the decision upon its erroneous conclusion that MDS was not a common carrier within the meaning of the Act's provisions. Eagleview also appeals a directed verdict against it on a Florida state law claim of civil theft, and the award of costs to the appellees under Federal Rule of Civil

_____
[*]    Honorable Julian Abele Cook, Jr., Senior U. S. District Judge for the Eastern District of Michigan, sitting by designation.

Procedure 54, issues treated summarily at the end of this opinion. We affirm.

This case began as a civil suit brought by Eagleview, against MDS, a District of Columbia general partnership, and its four general partners, David Anderson, Nancy Davis, James Dwyer, and David Hill. After Eagleview filed its complaint, because of disputes among the partners, Anderson was realigned as a plaintiff in the case. Anderson and Eagleview then jointly filed an amended complaint that contained ten claims, two of which are the subject of this appeal by Eagleview.

## I.     Communications Act Claim

A brief review of the facts is sufficient to understand the basis for our decision on this appeal. Anderson, Davis, Dwyer, and Hill formed a partnership, MDS Associates, in 1983, for the purpose of applying for ten different Multichannel Multipoint Distribution Service ("MMDS") licenses from the Federal Communications Commission ("FCC"). The partnership had no written agreement. The FCC issues MMDS licenses in a lottery. Ten years after they filed their application, the FCC granted MDS a license for the E-Group, a channel of four frequencies for San Diego. The license was subject to the condition that the licensee "provide service as a common carrier."

There followed a complex factual situation in which Anderson was at odds with the other three partners as to whether the partnership should utilize the license for

common carrier purposes or whether the group should seek non-common carrier status from the FCC. It is undisputed that Eagleview made a request to Anderson for common carrier service from MDS after it was issued a license for the E-Group channel. Also undisputed is that the partners other than Anderson decided they would rather act on a proposal from Prescient Telecommunications, Inc. offering either to enter into a joint venture with MDS, or to lease the E-Group channels from MDS as a non-common carrier. There were various maneuvers on both sides. MDS applied to change their status from common carrier to non-common carrier, and, although the FCC denied the request, MDS filed a second application for a change of status in 1994. A station was built by Anderson and Eagleview without permission or contribution from the other partners. It broadcast a test pattern, but the station has never provided service to any customer.

The case went to trial and at the close of all the evidence, the court granted the defendants' Federal Rule of Civil Procedure 50 motion judgment as a matter of law on the ground that Eagleview failed to prove that MDS was a common carrier. We review *de novo* a district court's grant of judgment as a matter of law. *See Isenbergh v. Knight-Ridder Newspaper Sales, Inc.*, 84 F.3d 1380, 1383 (11th Cir. 1996), *cert. denied*, 117 S.Ct. 2511 (1997).

Eagleview's case asserts that MDS violated sections 201(a) and 202(a) of the

4

Act, two sections that regulate the activities of common carriers. We agree with the district court's conclusion that for three reasons, MDS was not a common carrier as defined by the Act, and thus, did not violate the sections 201(a) and 202(a). First, we agree with the district court that MDS could not be a common carrier because it had never provided communications services. Second, we find that the district court correctly rejected Eagleview's assertion that MDS held itself out to be a common carrier. Third, we find that the district court correctly rejected Eagleview's claim that MDS was under regulatory compulsion to provide common carrier service.

First, MDS was not a common carrier as defined by the Act because it did not provide communications services. The act defined a common carrier to be:

> any person *engaged as a common carrier for hire*, in interstate or foreign communication by wire or radio or in interstate or foreign radio transmission of energy. . .

47 U.S.C. § 153(10). The FCC's regulatory interpretation of the Act further defines a common carrier to be, "any person *engaged in rendering communication service* for hire to the public." 47 C.F.R. § 21.2 (1992) (1992)(emphasis added). As the emphasized portions of the definition indicate, an entity is not considered a common carrier unless it is "engaged" in rendering services.

This interpretation is further supported by statutory language in sections 201(a) and 202(a) of the Act, the sections MDS is claimed to have violated. Section 201(a)

provides:

> It shall be the duty of every common carrier *engaged in interstate or foreign communication* by wire or radio to furnish such communication upon the reasonable request therefore . . .

47 U.S.C. § 201(a).

Likewise, section 202(a) provides:

> It shall be unlawful for any common carrier to make any unjust or unreasonable discrimination in *charges, practices, classifications, regulations, facilities, or services for or in connection with like communication service,* directly or indirectly, by any means or device, or to make or give any undue or unreasonable preference or advantage to any particular person . . .

47 U.S.C. § 202(a)(emphasis added).

Much like the language in the statute's definition of common carrier's, these sections clearly contemplate common carriers to be entities that are "engaged" in providing "communication services." In this case, all of the parties agree that MDS has never actually provided communications services to anyone and, in fact, that their MMDS station has only been used to send a single test pattern. The key words are to discriminate or give an undue preference "in connection with like communications services." The defendants have never given communication service to any person or entity. Logic dictates that a carrier would have to be giving service to at least one customer to be guilty of discrimination against or exercising a preference against

6

another. Accordingly, MDS cannot be considered a common carrier as defined by the Act.

Although Eagleview argues that case law interpreting the Act support's its claim that MDS was a common carrier, no case cited to this Court dealt with either the definition of a "common carrier" or a claim for discrimination or preference against an entity that was not actively involved in some kind of communication business. In every case, the entity which was sought to be charged with common carrier status was providing some kind of communications service to the public. *See e.g., American Tel. & Tel. Co. v. FCC*, 572 F.2d 17, 24 (2d Cir.), *cert. denied*, 439 U.S. 875, (1978); *National Association of Regulatory Utility Commissioners v. FCC*, 533 F.2d 601, 608 (D.C. Cir. 1976).

Second, we find Eagleview's argument that MDS held itself out to be a common carrier unpersuasive. Although Eagleview cites no authority to support the proposition that an entity can be considered a common carrier under the Act merely by holding itself out as a common carrier, we need not address this issue because the record does not indicate that MDS held itself out as a common carrier in its dealings with Eagleview.

We affirm the decision of the magistrate judge who tried this case with simply a mention of certain facts which she found not to be in dispute. Neither at the time of

7

the request, nor at any time since, for that matter, has MDS held itself out as able to provide service to the public as a common carrier. We note that the Prescient agreement upon which Eagleview relies for the preference prong of the argument was one which apparently would affect the ownership of the license itself or depended upon MDS being able to provide service as a non-common carrier. It did not offer or agree to provide common carrier services to Prescient.

The court stated: "In this case, MDS Associates had only four channels to offer and the facts of the case establish that when Eagleview made its request for service, the partners had not made a final decision concerning how the license would be utilized." The appellant makes the argument that the district court erroneously focused on the date the request was made. The fact is, however, that even if Eagleview's request for service is regarded as a continuing request, it has never become ripe for determination. There is no evidence that at any time since that request have the partners ever made a decision to operate under the license as a common carrier.

Although Anderson, acting on his own, accepted Eagleview's request for common carrier service, his acts cannot be imputed to MDS as a group. Both sides agree that the MDS partnership is governed by the District of Columbia's version of the Uniform Partnership Act which mandates that:

> Every partner is an agent of the partnership for the purpose of its business, and the act of every partner, including the execution of the  execution in the partnership name of any instrument, for apparently carrying on in the usual way the business of the partnership of which he is a member binds the partnership, *unless the partner so acting has in fact no authority to act for the partnership in the particular matter, and the person with whom he is dealing has knowledge of the fact that he has no such authority.*

D.C. Code § 41-108(emphasis added).[1]   In this case, the record indicates that Anderson did not have the authority to accept Eagleview's request for common carrier service, because when Eagleview made the request, the MDS partners had not decided how they wanted to use their MMDS License, or even whether they wanted to use the license at all.  The record also indicates that Eagleview knew it was dealing with Anderson alone when he accepted Eagleview's request, purported on behalf of MDS. Accordingly, Anderson's acts alone cannot establish that MDS held itself out to be a common carrier because Anderson's dealings with Eagleview were not binding on the MDS partnership.

Third, MDS was under no regulatory compulsion to offer common carrier service.

It is undisputed that MDS had the option of never building a station and

---

[1] Although this statute was repealed on January 1, 1998, it was the operative law at the time of this dispute.

allowing their license to lapse, and, in fact, the group originally awarded the E-Group channels did precisely that. Although FCC provisions might cause a forfeiture of the license if MDS does not meet the conditions of the license, and does not, in effect, go into the communications business by certain deadlines, there is neither a case nor a regulation that has been cited to this court that would make a licensee begin operations under a license if it decides not to utilize that license. At the time that the license was applied for, of course, MDS Associates had no choice but to operate as a common carrier if it was to operate at all. The district court noted that, "In 1987 the FCC amended the rules to allow licensees to elect whether they would operate as a common or non-common carrier. Since that time common carrier licensees have had the option of converting to a non-common carrier status." An application to convert the status of the license to one for a non-common carrier has been filed with the FCC and has been held in abeyance pending the resolution of this case.

The able lawyers for the appellant have failed to cite any case which would indicate that a third party such as Eagleview could require a licensee of the kind we have here to start a communications business as a common carrier, especially when it had an option to attempt to convert to non-common carrier status.

The defendants argue that MDS should not be regulated under the Act because it did not engage in foreign or interstate communications. The Act does not apply to

purely intrastate communication and states:

> Nothing in this chapter shall be construed to apply or to give the Commission jurisdiction with respect to (1) charges, classifications, practices, services, facilities, or regulations for or in connection with intrastate communication service by wire or radio of any carrier . . .

47 U.S.C.§ 152(b)(1).

The court addressed the contested issue as to how far the signal of the station would reach if it was put in operation and thought that factual issue prevented it from making a decision on that argument. Until there is a plan to put a station in operation, it would not seem that this issue can be ripe for determination.

In interpreting this prohibition, courts have held that the focus of the inquiry should be the nature of the service that is to be rendered. *See California v. FCC*, 4 F.3d 1505, 1514 (9th Cir. 1993) (and cases cited therein). No opinions exist, however, on how to treat a station that has not yet begun broadcasting.

Intertwined in this case have been the actions of David Anderson, asserted to be on behalf of and binding upon the partnership. There is no question but that those actions were committed without any prior authority and expressly disapproved by the other three partners. This fact was apparently known to Eagleview. Eagleview has cited no case which would indicate that the affairs of the partnership could be conducted by a single partner, without authority or approval of the majority of the

11

general partners.

## II.    Civil Theft Claim

As to its civil theft claim, Eagleview has adopted the arguments made by its co-plaintiff, Anderson, in a separate appeal, No. 96-2945. In a separate unpublished opinion on that appeal we have explained that the decision for the defendants on the civil theft issue was correct because neither Anderson nor Eagleview established that the defendants acted with the requisite criminal intent.

## III.    Award of Costs

This Court reviews a cost award for clear abuse of discretion. *See Cochran v. E.I. duPont de Nemours & Co.*, 933 F.2d 1533, 1540 (11th Cir.1991), *cert. denied*, 502 U.S. 1035 (1992). In this case we would affirm the award of costs under our Eleventh Circuit Rule 36-1 without opinion. *See Terry Properties, Inc. v. Standard Oil Co.*, 799 F.2d 1523, 1540 (11th Cir.1986) (awarded costs even though they did not win their counterclaims).

## IV.    Conclusion

The court did not err in finding that no jury could properly determine that MDS was a common carrier within the meaning of the Communications Act of 1934, 47 U.S.C. section 207. Therefore, Eagleview did not have a claim under either section 201(a) or section 202(a) of that Act. The court did not err in deciding that there was

insufficient evidence for a jury to decide that the defendants had the requisite felonious intent to be liable under Florida's civil theft statute. The district court did not abuse its discretion in awarding costs to the defendants as the prevailing parties in this case.

**AFFIRMED.**